16th JUDICIAL DISTRICT COURT FOR THE PARISH OF ST MARY

STATE OF LOUISIANA

No. _____ 1 3 7 9 3 5

SECTION _____ DIV. "G"

GARY BLUM AND LUCIA BILLIOT
individually and as representatives of all those similarly situated,

Plaintiffs

VS.

AT&T, CORP.; AT&T, INC.; BELLSOUTH TELECOMMUNICATIONS, LLC d/b/a AT&T
LOUISIANA; VERIZON COMMUNICATIONS, INC.; LUMEN TECHNOLOGIES, INC.
d/b/a CENTURYLINK, INC.; CENTURYLINK COMMUNICATIONS, LLC,

Defendants

FILED: _____ NOV 0 6 2023 _____          DEPUTY CLERK: _____ JENNIFER R. SPLANE

---

## CLASS ACTION PETITION

INTO COURT, through undersigned counsel, come GARY BLUM and LUCIA BILLIOT,

on behalf of themselves and others similarly situated, who file this Class Action Petition against

AT&T, Corp., AT&T, Inc., BellSouth Telecommunications, LLC d/b/a AT&T Louisiana, Verizon

Communications, Inc., Lumen Technologies, Inc. d/b/a CenturyLink, Inc, and CenturyLink

Communications, LLC.  In support of these claims, Plaintiffs allege as follows:

### PARTIES

*Plaintiffs*

**1.**

Plaintiffs, GARY BLUM and LUCIA BILLIOT are Louisiana citizens who own properties

affected by the Defendants' conduct in Louisiana.

**2.**

**Plaintiff Class.** The Named Plaintiffs herein proposes to proceed on behalf of a class of

persons defined as follows:

> *All natural and juridical persons (excluding any state agencies or commissions,*
> *and excluding the U.S. federal government and any agencies or departments*

3810755v1

EXHIBIT
A

*thereof) who own immovable property in Louisiana that has been damaged by*

*Defendants' lead-covered telephone cables and associated lead equipment.[1]*

Excluded from the Class are the Judge to whom this case is assigned and his or her immediate family. The Plaintiffs reserve the right to revise the definition of the Class based on information learned through discovery.[2]

### *Defendants*

**1.**

**Defendant AT&T Corp.** is a New York Corporation having its principal place of business in Bedminster, New Jersey.

**2.**

**Defendant AT&T Inc.** is a Delaware Corporation having its principal place of business in Dallas, Texas.  AT&T Inc.'s common stock trades on the New York Stock Exchange under the ticker symbol "T."

**3.**

**Defendant BellSouth Telecommunications, LLC d/b/a AT&T Louisiana** is a Georgia limited liability company having its principal place of business in Georgia.  On information and belief, the sole member of BellSouth Telecommunications, LLC is BellSouth, LLC. BellSouth, LLC is a Georgia limited liability company whose sole member is AT&T DataComm, L.P. AT&T DataComm, L.P. is a Delaware limited partnership whose partners consists of by AT&T DataComm Holdings, LLC (99.99% limited partner) and BellSouth Mobile Data, Inc. (0.01% general partner). AT&T DataComm Holdings, LLC is a Delaware limited liability company, whose sole member is BellSouth Mobile Data, Inc., a Georgia corporation incorporated and with its principal office in Georgia.

---

[1] Plaintiffs specifically exclude personal injury damages from the class claims and relief sought.
[2] The individually named plaintiffs and the putative class members are hereinafter collectively referred to as "Plaintiffs."

3810755v1

2

**4.**

**Defendant Verizon Communications, Inc.** is a Delaware Corporation having its principal place of business in New York, New York. Verizon's common stock trades on the New York Stock Exchange under the ticker symbol "VZ."

**5.**

**Defendant, CenturyLink Communications, LLC** is a Delaware limited liability company having its principal place of business in Louisiana. On information and belief, CenturyLink Communications, LLC's sole member is Lumen Technologies, Inc., which is a Louisiana corporation having its principal place of business in Monroe, Louisiana.

**6.**

**Defendant Lumen Technologies, Inc.** is a Louisiana corporation having its principal place of business in Monroe, Louisiana. Lumen Technologies, Inc.'s common stock trades on the New York Stock Exchange under the ticker symbol "LUMN."

**7.**

Defendants are jointly and solidarily liable for the damages to Plaintiffs.

**JURISDICTION AND VENUE**

**8.**

This Court has personal jurisdiction over Defendants because Defendants are limited liability companies or corporations with sufficient minimum contact with the State of Louisiana to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. Indeed, Defendants have conducted and continue to conduct substantial business in Louisiana.

**9.**

Venue is proper in this Court pursuant to the Louisiana Code of Civil Procedure, as the Defendants' conduct alleged herein took place in this Judicial District.

3810755v1

## ALLEGATIONS

**A.     Defendants' have left behind a sprawling network of lead telecommunications cables and equipment.**

### 10.

Defendants have left behind an extensive network of lead-covered cables and other associated lead equipment stretching across Louisiana. Defendants' profit-driven decision to leave these dangerous lead-covered cables and associated lead equipment in place was made even though the cables and associated equipment have, in whole or in large part, become obsolete and have been replaced by several newer, safer generations of telecommunications cables and equipment.

### 11.

Defendants' decision to line their own pockets by leaving the leaden cables and equipment strewn all over Louisiana has caused significant damage to property across Louisiana and is a violation of the law.

### 12.

Defendants own and/or operate the lead-covered cables and equipment and are responsible for their removal and for restoration of the property damage that the lead cables and equipment have caused, including soil and water contamination.

### 13.

Defendants' predecessors installed the majority of the lead-covered cables and equipment prior to the 1970s.

### 14.

When technology advanced, Defendants and their predecessors upgraded the telephone lines by installing new ones, first utilizing plastic sheathed lines and, later, fiber optic lines, as the industry standard for telephone cables and equipment.

### 15.

On information and belief, Defendants used the new technologies to install plastic-sheathed lines across Louisiana in the 1980s and/or 1990s. Later, in the 2000s, Defendants installed the newest advancement in telecommunication equipment—fiber optic cables—across Louisiana.

3810755v1

4

Despite these advancements and Defendants' installation and use of multiple upgraded telephone networks across Louisiana, Defendants made the decision to leave the degraded and largely obsolete lead-covered cables and associated lead equipment in the ground and on the surface all over Louisiana.

**16.**

Defendants have known for decades that the lead-covered cables and associated equipment should be removed and that the cables posed an environmental hazard to people, animals, and property.  But instead of removing the lead cables and equipment or warning the public about the presence of lead on property across the United States, Defendants kept silent in the hopes that this unknown source of lead contamination would remain undiscovered and that they would not have to pay to remove it.  And, in fact, due to Defendants' concerted actions to keep these sources of lead a secret, for many decades the lead telecommunications cables and equipment went undiscovered.

**17.**

It was not until the *Wall Street Journal* revealed its extensive investigation in July 2023 that this "hidden source of contamination" was brought to light.[3]

**18.**

The *Wall Street Journal* reporters visited approximately 300 sites, collecting around 200 environmental samples from nearly 130 of those sites.[4]  The lead cables were found near and under water, in the soil, and hanging overhead near bus stops and playgrounds.[5]  "Roughly 330 of the total number of underwater cable locations identified by the *Journal* are in a 'source water protection area,' designated by federal regulators as contributing to the drinking-water supply, according to an EPA review performed for the Journal."[6]

**19.**

The *Wall Street Journal's* investigation was detailed and involved collecting and reviewing

---

[3] Pulliam, *America is Wrapped in Miles of Toxic Lead Cables*, July 9, 2023: https://www.wsj.com/articles/lead-cables-telecoms-att-toxic-5b34408b.
[4] *Id.*
[5] *Id.*
[6] *Id.*
3810755v1

5

thousands of records and taking hundreds of samples: "To track the underwater cables, the *Journal* collected more than 40,000 pages of records from federal and state government offices, including applications to the U.S. Army Corps of Engineers to install the cables…"[7]

**20.**

The *Wall Street Journal* reported:

> Lead levels in sediment and soil at more than four dozen locations tested by the *Journal* exceed safety recommendations by the U.S. Environmental Protection Agency. At the New Iberia fishing spot, lead leaching into the sediment near a cable in June 2022 measured 14.5 times the EPA threshold for areas where children play. 'We've been fishing here since we were kids," said Tyrin Jones, 27 years old, who grew up a few blocks away.[8]

**21.**

According to the *Wall Street Journal*, the lead cables are a "relic of the Old Bell System's regional telephone network." "The cables, often contained hundreds of bundled copper wires, had a thick jacket of lead for insulation, to prevent corrosion and to keep out water.  For underwater cables, steel cords sometimes surrounded the lead for further protection. When technology advanced and companies turned to plastic sheathing and, later, fiber optics, they often left the old lines in place."[9]

**B.    Lead is dangerous and lead exposure can result in serious health problems.**

**22.**

Lead is toxic to humans and animals. No amount of lead is safe in the environment. Lead exposure can lead to significant health issues. For example, lead exposure can cause damage to the central nervous system, kidney problems, neurological problems, cardiovascular problems, lung disease, reproductive problems, cancer, hearing and speech problems, hyperactivity, memory problems, trouble concentrating, and behavior and learning problems.

**23.**

The Environmental Protection Agency ("EPA"), Food and Drug Administration ("FDA"), the World Health Organization ("WHO"), Center for Disease Control and Prevention ("CDC"), and the American Medical Association ("AMA") have all independently stated that there is no

---

[7] *Id.*
[8] *Id.*
[9] *Id.*
3810755v1

safe level of lead.

**24.**

The EPA proclaims: "The MCLG for lead is zero. EPA has set this level based on the best available science which shows there is no safe level of exposure to lead. The fact that there is no safe level of exposure underscores the fact that any action to reduce exposures can have impacts on lives and livelihoods."[10]  Similarly, (1) the WHO has likewise stated that "[t]here is no known safe blood lead concentration"[11]; (2) the CDC stated that "no safe blood lead level has been identified"; (3) the FDA has declared that "[n]o safe level of lead exposure has been identified for protecting children's health"[12] and that "[l]ead is toxic to humans and can affect people of any age or health status"[13]; and (4) the AMA explains that "we know that there is no safe level of lead."[14]

**25.**

The CDC warns that lead in soil is "hazardous."[15]  Lead can be transferred from the soil into the body by being inhaled as soil dust or by being directly ingested.  Exposure to lead in soil is especially likely to occur in children:

- Children can be exposed to lead in soil by swallowing or breathing in lead-contaminated soil while playing.

- Lead-contaminated soil particles can also be brought inside as lead dust or on shoes, clothing, or pets.

- Young children tend to put their hands, which may be contaminated with lead dust from soil, into their mouths.

- Some young children eat soil (this is called pica). Children may also be exposed to lead by eating fruits and vegetables grown in or near lead-contaminated soil.[16]

---

[10] EPA, *Basic Information about Lead in Drinking Water*: https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water.
[11] WHO, *Lead Poisoning*: https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health.
[12] FDA, *Action Levels for Lead in Food Intended for Babies and Young Children: Draft Guidance for Industry*, January 2023: https://www.fda.gov/media/164684/download.
[13] FDA, *Lead in Food, Foodwares, and Dietary* Supplements: https://www.fda.gov/food/environmental-contaminants-food/lead-food-foodwares-and-dietary-supplements#:~:text=Lead%20is%20toxic%20to%20humans,in%20food%20can%20be%20reduced.
[14] AMA, *AMA adopts new policies to prevent future lead poisoning*: https://www.ama-assn.org/press-center/press-releases/ama-adopts-new-policies-prevent-future-lead-poisoning
[15] CDC, *Lead in Soil*: https://www.cdc.gov/nceh/lead/prevention/sources/soil.htm
[16] *Id.*

3810755v1

**26.**

The CDC further warns that "[l]ead in soil can get into groundwater."[17] "EPA has set the maximum contaminant level goal for lead in drinking water at zero because lead can be harmful to human health even at low exposure levels."[18]

**27.**

Lead exposure can lead to immediately ascertainable health impacts.  Lead exposure can also lead to latent health issues long after exposure due to lead being stored in tissue and bones for decades.

**C.**     **Defendants' network of lead sheathed cables and associated lead equipment litters Louisiana and is a violation of Louisiana law.**

**28.**

The lead-covered cables and the associated lead equipment are an unlawful intrusion on private property and are causing property damage and a risk to human health. Defendants have violated Louisiana law.

**29.**

Article IX, section 1, of the Constitution of the State of Louisiana provides: "The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. The legislature shall enact laws to implement this policy."

**30.**

In New Orleans, the *Wall Street Journal* reported a lead cable sticking out from under a bridge where tourists walk and where homeless people live. "Lead in the sediment there was 19.8 times the EPA guidelines for where children could play."[19]

**31.**

The *Wall Street Journal* went on to report that,

---

[17] CDC, *ToxFAQs for Lead*: https://wwww.cdc.gov/TSP/ToxFAQs/ToxFAQsDetails.aspx?faqid=93&toxid=22.
[18] CDC, *Lead in Drinking Water*: https://www.cdc.gov/nceh/lead/prevention/sources/water.htm
[19] Pulliam, *America is Wrapped in Miles of Toxic Lead Cables*, July 9, 2023: https://www.wsj.com/articles/lead-cables-telecoms-att-toxic-5b34408b.
3810755v1

Atop a levee in Donaldsonville, La, along the Mississippi, families often stroll near two abandoned cables, one smashed on the ground and the other with a splice box, a large lead casing used to connect cables sealed with molten lead.[20] A sediment sample taken next to the smashed cable and splice box showed lead at "2,850 and 2,800 parts per million, respectively—both seven times the EPA guideline for play areas."[21] "Across the street from the park in a yard strewn with children's toys, an extension of a lead-covered cable and a lead slice box sit in the front of the house of ... a 60-year-old mail carrier who had 10 grandchildren. The [sampling] showed a reading of more than 4,000 parts per million at the site of this cable.[22]

**32.**

A cable in New Iberia on Bayou Teche is located where the town hosts a "gumbo cook-off and an annual canoe race."[23]

**33.**

"Another lead-sheathed cable juts out of a swampy pond next to Bayou Teche in Franklin, [Louisiana]. An analysis of the water sample from the pond showed lead at 471 parts per billion."[24]



**Photo credit:** *Wall Street Journal*

**34.**

Bayou Teche was deemed an "epicenter of America's lead cable problem" by the *Wall Street Journal.*[25]

---

20 *Id.*
21 *Id.*
22 *Id.*
23 *Id.*
24 *Id.*
25 West, *Bayou Teche is an Epicenter of America's Lead Cable Problem*, July 10, 2023: https://www.wsj.com/articles/lead-cables-louisiana-telecoms-59f36ffe?mod=series_leadlegacy
3810755v1

> Reporters found cables protruding from banks, resting under bridges, snaking under water and drooping from the air at dozens of sites. Testing showed that many are leaching toxic metal into the ground and water. Southern Louisiana's 125-mile-long Bayou Teche flows through a region particularly dense with cables. Southern Bell filed permits with the U.S. Army Corps of Engineers starting in the 1930s to place more than a dozen cables across the bayou. *Journal* reporters, with the assistance of environmental researchers, tested the water in nine places along the bayou and the sediment in three of them. Of those 12 tests, eight showed elevated levels of lead. A sediment sample near the cable in New Iberia exceeded the safety recommendation set by the Environmental Protection Agency for areas where children play.[26]

Parts of Bayou Teche are used for drinking water.

### 35.

In New Iberia, one of the cables sits near the center of town on the surface near a sidewalk and crossing under the water near the bridge.[27] "The cable runs underground and under the bayou to a point on the opposite bank, where it rises up from the surface. The cable would have connected to a telephone pole—all that's left is a chopped-off remnant."[28]



**Photo credit:** *Wall Street Journal*

### 36.

According to the *Wall Street Journal*, "here's how the contamination happens" in the soil and the water surrounding the lead cables and equipment:

---

[26] *Id.*
[27] *Id.*
[28] *Id.*
3810755v1

10



Photo credit: Wall Street Journal

**37.**

"An environmental consultant who lives in New Iberia [and was interviewed by the *Wall Street Journal*], said cables like the one in her town, sticking up from the ground on the bank, are a potential attraction for children. They 'don't know it's lead,' she said. 'There is no warning sign.'"[29]

**38.**

The locations where the *Wall Street Journal* found leaden cables in St. Mary Parish were often not far from schools and were near where children play.[30]



Lead in the New Iberia cable sediment sample was **14.5 times** the EPA's recommended threshold for children's play areas.

Photo credit: *Wall Street Journal*

---

[29] *Id.*
[30] *Id.*
3810755v1

**D.      The Environmental Defense Fund also investigated the Lead-Sheathed Telecommunications Cables and Equipment.**

**39.**

In association with the *Wall Street Journal*, the Environmental Defense Fund conducted its own "Lead Cable Investigation."[31] Through its investigation, the Environmental Defense Fund visited and took environmental samples at lead telephone cable/equipment sites all over the country identified by the *Wall Street Journal*. As part of the report ultimately published by the Environmental Defense Fund, photos were taken of the lead cables and equipment.  Some of those photos are included below:



**(E) Rd. 320 southeast of New Iberia, LA. Cluster of lead sheathed cables under the Oliver Bridge. BT 17.1. June 2022, New Iberia, Louisiana.**

**Photo credit: Environmental Defense Fund**

---

[31] June 30, 2023, Environmental Defense Fund, *Lead Cable Investigation*:
https://www.edf.org/sites/default/files/2023-07/MTS_EDF%20Lead%20Cable%20Investigation_Final.pdf.
3810755v1



(F) Up close photo of bare lead sheathed cables coming from the bottom of a lead splice box (upper left corner of photo). BT 24.1. June 2022. St. Martinville, Louisiana.

Photo credit: Environmental Defense Fund



(H) Exposed lead splice box with attached cables and drainage into the Bayou Teche. BT 26.2. June 2022. Franklin, Louisiana.

Photo credit: Environmental Defense Fund

 

(M) Donaldsonville, LA. Location MISS 12.1. Exposed leaded splice box that appears to still be connected to an air test line. See photo (L) for the abandoned cable just the other side of the splice box. June 2022.

(G) Bare lead sheathed cables going into a lead splice box near the sidewalk leading into the Historical District. BT 24.1. June 2022, St Martinville, Louisiana.

**Photo credits: Environmental Defense Fund**

 

(L) New Orleans, LA. MISS 3.1. Remnants of outer steel wire from a lead sheathed cable. Evidence that parts of the cable may have been scrapped for issues. I reads (ish) as that that was done to these cables.

(J) New Orleans, LA. MISS 3.1, is an abandoned collection of cables.

**Photo credits: Environmental Defense Fund**



(N) Donaldsonville, LA. Location MISS 12.1. Close up of lead sheathed
cable next to lead splice box seen in (K). June 2022.

**Photo credit: Environmental Defense Fund**

**40.**

    The Environmental Defense Fund concluded that the "findings in Louisiana were robust" and "recommended that a more in-depth survey of the state be performed" because it found that "it is likely that more lead sheathed cables would be discovered."[32]

**41.**

    Further, in its June 17, 2023 letter to the Environmental Protection Agency, the Environmental Defense Fund implored the EPA to act upon the "uncontrolled release of lead into the water or surface soil from more than 2,000 lead-sheathed telecom and power cables across the nation with more than 300 of these cables posing a threat to the source of drinking water for communities."[33] The Environmental Defense Fund concluded that it "expect[s] that the risk posed by the cables will increase as they further deteriorate and release lead into the environment."[34] The Environmental Defense Fund recommended "immediate removal" of many of the lead-sheathed cables and junction boxes, as well as removal of the "soil contamination" caused by the lead cables

---

[32] *Id.*
[33] July 17, 2023, Letter from the Environmental Defense Fund to the Environmental Protection Agency (https://www.edf.org/sites/default/files/2023-07/EDF-CWA-BtB%20Letter%20to%20EPA%20Administrator%20on%20Lead%20Cables%20-%20FINAL%207-17-23.pdf)
[34] *Id.*
3810755v1

and equipment.[35]

**E.     Louisiana is littered with lead telephone cables and lead telecom equipment.**

**42.**

The Environmental Defense Fund's prognosis that Louisiana's lead telephone cable problem is far more widespread than its investigation showed was spot-on. In fact, the *Wall Street Journal* and the Environmental Defense Fund only uncovered the tip of the iceberg when it comes to the extent of the lead telephone cables and telecom equipment strewn across Louisiana.

**43.**

In Franklin, Louisiana, many additional locations of lead telephone cables and telecom equipment have been identified.  The following photos are examples of these locations:

 

---

[35] *Id.*
3810755v1





**44.**

The following is an example of lead telecom equipment found in Lafayette, Louisiana:



3810755v1

**45.**

The following are examples of lead telecom equipment located in St. Bernard Parish:

 

**46.**

The following are examples of lead telecom equipment found in Morgan City, Louisiana:

 



**47.**

On information and belief, there are thousands of other locations across Louisiana where Defendants have left their lead cables and equipment.

### F.      The lead equipment and cables found on the Named Plaintiffs' properties are typical of the class.

The lead splice boxes and associated lead cables found on the Named Plaintiffs' properties are typical of the class.  A comparison of the pictures of the lead splice boxes identified by the *Wall Street Journal* and the Environmental Defense Fund shows that the lead splice boxes and associated cables found on the Named Plaintiffs' properties are typical of the class as a whole.

**48.**

For instance, the lead splice box and associated lead cables found on Gary Blum's property is pictured below:



3810755v1

**49.**

The lead splice box found on Lucia Billiot's property is pictured below:

 

**G.    Defendants continue to disguise the lead cables and associated lead telecom equipment instead of removing them.**

**50.**

In a written statement to the *Wall Street Journal*, AT&T stated: "The health, safety, and well-being of our people, our customers, and our communities is of paramount importance."[36] Similarly, Verizon said it is "taking these concerns regarding lead-sheathed cables very seriously."[37]

**51.**

Despite these statements, instead of removing the offending lead cables and equipment identified by the *Wall Street Journal* and the Environmental Defense Fund, Defendants have chosen, once again, to take the cheap way out and put a Band-Aid over the problem.

**52.**

For example, in Franklin, Louisiana, instead of removing the lead splice box and the associated lead cables, Defendants chose the cheapest solution, which was to simply cover the splice box with a plastic cover. Defendants did nothing to remove the lead cables or equipment,

---

[36] Pulliam, *America is Wrapped in Miles of Toxic Lead Cables*, July 9, 2023: https://www.wsj.com/articles/lead-cables-telecoms-att-toxic-5b34408b.
[37] *Id.*
3810755v1

nor did they take any steps to prevent the lead from the cables or equipment under the plastic box

from continuing to come into contact with the soil, the surface water, including potentially Bayou

Teche, or the groundwater.

 

**53.**

Similarly, in New Iberia, LA, instead of removing the lead splice box and associated cables,

Defendants chose to place a piece of metal over part of the splice box. This piece of metal does

not protect the lead splice box from the elements, nor does it do anything to prevent this lead

equipment from continuing to degrade and contaminate the soil or water nearby. In fact, a picture

taken from above the metal cover shows that the lead splice box is still in place and exposed to the

elements.



3810755v1

H.      **Defendants' concerted action to keep their legacy of lead a secret.**

54.

Defendants engaged in a concerted action to hide the presence of the lead telecommunications cables and equipment from the public.

55.

Defendants made false and misleading statements and disclosures about their commitment to protecting the environment and upholding safety and other regulatory standards. When Defendants made these false and misleading statements, they failed to disclose that they own lead cables and equipment around the country, including in Louisiana, that are highly toxic, dangerous to people, and harmful to the environment.

56.

On information and belief, Defendants made false statements to and failed to disclose the presence of the lead cables and equipment to regulators as part of a concerted action to avoid regulatory liability or other liability.

57.

Defendants were uniquely aligned and similarly financially motivated to avoid the cost of removing the lead telecommunications cables and equipment and the remediation of the contamination caused by the lead telecommunications cables and equipment.

58.

Defendants were in possession of confidential proprietary information concerning the lead cables and equipment, and they colluded to not share it with the public, their investors, regulators, or other government and trade officials in order to avoid the costs of removal, remediation, and other liability.

59.

Defendants not only have an interest in keeping the existence of their own lead cables and equipment a secret, they also have an interest in keeping each other's lead legacy a secret.  In many circumstances, Defendants have entered into agreements with one another to use each other's telephone cables and equipment. The Defendants control a huge segment of the telephone industry.

3810755v1

By using each other's cables, equipment, and networks, they are able to control even more of the market. It was in the Defendants' joint interest for the lead cables and equipment to go undetected, such that they could continue to build their telecom dynasties and castoff the liability associated with the lead legacy they were leaving behind.

**60.**

Even after the *Wall Street Journal* broke the story and the existence of the lead cables and equipment was uncovered, Defendants have continued to act in concert to keep the location and extent of the lead cables and equipment a secret.

**CLASS ACTION REQUISITES**

**61.**

The Named Plaintiffs and all those similarly situated, as defined above, are entitled to maintain this action as a class action pursuant to La. C.C.P. art. 591 for the following reasons:

61.1     The Class consists of more than 40 individuals who own property impacted by Defendants' conduct, so numerous that joinder of all members is impracticable, satisfying La. C.C.P. art. 591(A)(1).

61.2     Questions of law and fact common to all members of the Class are numerous, satisfying La. C.C.P. art. 591(A)(2); and those common questions of law and fact also predominate over individual issues, satisfying La. C.C.P. art. 591(B)(3). Those common questions of law and fact include but are not limited to:

61.2.1     Whether Defendants' conduct alleged herein violates the laws as stated in the Causes of Action section, *infra*;

61.2.2     The steps Defendants could have taken to remove the lead-covered cables and associated lead equipment.

61.2.3     The steps Defendants could have taken to prevent the contamination of soil, surface water, and groundwater;

61.2.4     Whether Defendants owe a duty to the Class;

61.2.5     Whether Defendants breached those duties to the Class;

61.2.6     Whether Defendants are responsible for the removal of the lead-covered cables and associated lead equipment.

61.2.7     Whether Defendants are liable to putative Class Members for damages related to the contamination of soil, surface water, and/or groundwater.

61.2.8     The measure of damages to putative Class Members;

61.2.9     Whether Defendants are liable for attorneys' fees and costs pursuant to applicable law.

61.2.10    The appropriate nature of class-wide relief;

61.3     The claims of the Named Plaintiffs, who own property upon which, or adjacent to, the Defendants' lead-based cables and/or equipment, are typical of the claims of the proposed Class Members against Defendants, as required under La. C.C.P. art. 591(A)(3), because the Named Plaintiffs reside in Louisiana and own property propinquitous to Defendants' lead-covered cables and/or equipment, and that property has been unlawfully invaded by and/or otherwise damaged by the lead cables and/or equipment.

61.4     The Named Plaintiffs will fairly and adequately protect the interests of the proposed Class, as required under La. C.C.P. art. 591(A)(4), because they have an interest in removal of the lead cables/equipment, in preventing or ameliorating future deleterious effects of contamination on their property, and rectifying the damage caused by past contamination to their property.

61.5     The criteria for defining the proposed Class, as set out above, are objectively ascertainable on the face of written instruments—namely, people who own immovable property that has been damaged by Defendants' lead-covered cables and equipment in Louisiana.

61.6     Certification of a Class under La. C.C.P. art. 591(B)(1) is appropriate, because the prosecution of separate actions by individuals rather than a Class as proposed would create a risk of inconsistent or varying adjudications and the

3810755v1

potential for imposition of inconsistent duties owed by Defendants and for prejudicial determinations as to the rights of subsequent plaintiffs, as Defendants' conduct has harmed multiple class members based on a common pattern of conduct, with that harm being of a common character through a common causal process.

61.7    Alternatively, certification of a Class under La. C.C.P. art. 591(B)(2) is appropriate because, due to the widespread effect of the Defendants' actions, any resistance of liability by the Defendants would be applicable to the whole of the proposed class, making class-wide injunctive relief appropriate.

61.8    Alternatively, if damages are deemed an appropriate remedy rather than class-wide adjudication of rights under La. C.C.P. art. 591(B)(1) or injunctive relief under La. C.C.P. art. 591(B)(2), then certification under La. C.C.P. art. 591(B)(3) is appropriate because, as noted above, the common issues of fact and law predominate over those issues that may pertain to individual plaintiffs' claims.

61.9    Also in satisfaction of La. C.C.P. art. 591(B)(3), the class action procedure is superior to other methods for the fair and efficient adjudication of the claims herein, because:

61.9.1    It is desirable to concentrate all litigation regarding the removal of the lead cables/equipment and the crisis created due to the contamination of the soil, surface water, and groundwater within a single forum;

61.9.2    Class litigation is an efficient mechanism for managing the claims of the class members, due to the opportunity to afford reasonable notice of significant phases of the litigation to class members and to permit a systemic and integrated remedy and injunctive relief or, alternatively, distribution of any damages recovered; and

61.9.3    The vindication of public policy interests in addressing contamination in requiring Defendants' to comply with the law are implicated and therefore justify the invocation of the process of class litigation, including any attendant costs or burdens.

3810755v1

26

61.9.4    Upon a determination of liability, causation, and entitlement to remedy, this Court may appoint a special master to administer a remediation and restoration plan and/or apportionment among the class members of compensation for restoration costs and damages as appropriate.

61.10    Further, even if the Court were to determine that certification is not appropriate as to some issues in this litigation, it may certify the Class for purposes of those particular issues that resolve common, class-wide issues as to which inconsistent adjudication would be detrimental, under La. C.C.P. art. 592(D).

## CAUSES OF ACTION

### COUNT 1: NEGLIGENCE (CLASS COUNT)

**62.**

Plaintiffs incorporate by reference all allegations in the preceding and subsequent paragraphs as if fully set forth herein.

**63.**

Defendants, while engaging in the operation of their telecommunications business, have a duty to use reasonable care to avoid damage to others. This duty has existed throughout the time each of the Defendants owned and/or operated the lead-covered cables and associated lead equipment.

**64.**

Defendants also have and have had a duty to comply with various Louisiana regulations and laws governing environmental contamination and lead.

**65.**

As specified in the allegations above, Defendants breached these duties while owning and operating the lead-covered cables and associated lead equipment, which has resulted in damage to Plaintiffs' Property.

3810755v1

**66.**

Plaintiffs were not aware that Defendants had left lead cables and equipment on, or adjacent to, their property or that the lead cables and equipment had contaminated their property until, at the earliest, the *Wall Street Journal's* reporting in July 2023.

**67.**

Defendants have a duty to remove the offending lead-covered telephone cables and associated lead-based equipment that is on, or adjacent to, Plaintiffs' property.

**68.**

In addition, Defendants have and have had the duty to clean up any contamination resulting from their lead cables and/or equipment, including in the soil, surface water, and groundwater, and to prevent it from migrating onto neighboring properties.

**69.**

As a result of each Defendant's breach of these various duties, lead-covered telephone cables and associated lead equipment remain on, or adjacent to, Plaintiffs' Property and must be removed. Further, the soil, surface water, and groundwater on and underlying the Plaintiffs' Property is contaminated with lead. Defendants are therefore liable for all damages and remedies detailed further below.

**70.**

Plaintiffs did not have knowledge of the damages sought herein before 2023.

**COUNT 2: BREACH OF THE OBLIGATIONS OF HOLDERS OF PERSONAL SERVITUDES OF RIGHTS OF USE, THROUGH BREACH OF SUPPLETIVE-RULES OBLIGATIONS AND VIOLATION OF PUBLIC POLICY (CLASS COUNT)**

**71.**

Plaintiffs incorporate by reference all allegations in the preceding and subsequent paragraphs as if fully set forth herein.

**72.**

In circumstances where Defendants or their predecessors obtained right-of-way agreements that gave them the authority to install the telecommunications cables and equipment on the Plaintiffs' Property, a personal servitude of right of use in favor of one or more of the

3810755v1

Defendants was created. A right of use is a limited personal servitude that confers the benefits of the predial servitude and usufruct upon a juridical person rather than upon an estate.

**73.**

While in some circumstances, Defendants obtained right of use servitudes directly from Plaintiffs themselves. In other circumstances, Defendants obtained rights of use and/or permits from the State of Louisiana, the parishes, or other local governments, for which the Plaintiffs are third party beneficiaries.

**74.**

Pursuant to Louisiana Civil Code article 645, "[a] right of use is regulated by application of the rules governing usufruct and predial servitudes to the extent that their application is compatible with the rules governing a right of use servitude."

**75.**

Regarding the rules governing usufruct, Louisiana Civil Code article 576 provides that "the usufructuary [Defendant] is answerable for losses resulting from his fraud, default, or neglect." Louisiana Civil Code article 577 similarly provides:

> The usufructuary [Defendants] is responsible for ordinary maintenance and repairs for keeping the property subject to the usufruct in good order, whether the need for these repairs arises from accident or force majeure, the normal use of things, or his fault or neglect.

> The naked owner [Plaintiffs] is responsible for extraordinary repairs, unless they have become necessary as a result of the usufructuary's [Defendants'] fault or neglect in which case the usufructuary [Defendants] is bound to make them at his cost.

**76.**

Defendants are obligated under Civil Code article 539 to use the class members' properties as a prudent administrator, and to preserve those properties as much as possible so that the properties may be restored to the class members at the end of the right-of-use servitude.

**77.**

Louisiana Civil Code article 579 provides that, "[d]uring the existence of the usufruct, the naked owner [Plaintiffs and those similarly situated] may compel the usufructuary [Defendants] to make the repairs for which the usufructuary is responsible."

3810755v1

**78.**

Regarding the rules governing predial servitudes, Defendants became the dominant estate owners while Plaintiffs are the owners of the servient estate.

**79.**

Under Louisiana Civil Code article 730, "doubt as to the existence, extent, or manner of exercise of a predial servitude shall be resolved in favor of the servient estate."

**80.**

Louisiana Civil Code article 743 provides that rights that are necessary for the use of the servitude "are to be exercised in a way least inconvenient for the servient estate"; and article 745 provides that the dominant estate owner is "under the obligation of causing the least possible damage."

**81.**

Defendants also had the obligation to not aggravate the condition of the class members' servient estates.

**82.**

Defendants cannot be exonerated from these obligations because such exoneration would violate clear Louisiana public policy requiring the preservation of the natural resources of Louisiana.

**83.**

Accordingly, the Defendants had obligations to Plaintiffs to operate in such a manner that did not result in lead-covered cables and associated lead equipment being left on Plaintiffs' Properties long after it was obsolete and newer, safer materials were available and to prevent damage to Plaintiffs' Properties as a result of the lead telecommunications cables and equipment, including preventing contamination of soil, surface water, and groundwater.

**84.**

Defendants breached these obligations, and as a result lead-covered cables and associated lead equipment remain on, or adjacent to, Plaintiffs' Properties, and the properties have been contaminated by the presence of the lead-based telecommunications cables and equipment.

3810755v1

**85.**

Defendants breached these obligations by failing to remove the lead telecommunications cables and equipment and failing to repair any damage to Plaintiffs' Properties caused by the lead cables and equipment. These actions constitute breaches of Defendants' obligations to not aggravate and to cause the least possible damage to the servient estate.

**86.**

Defendants have breached and continue to breach the foregoing obligations.

**87.**

Defendants' duties to not aggravate the condition of the servient estate are co-extensive with the life of the servitudes and, accordingly, are continuous.

**88.**

Defendants are in continuing breach of those obligations and duties.

**89.**

The damage to Plaintiffs' property was reasonably foreseeable to Defendants.

**90.**

Defendants' have long known that the lead telecommunications cables and equipment are leeching lead into the environment, including on and adjacent to Plaintiffs' Properties, and that lead is dangerous and hazardous to human health.

**91.**

Defendants colluded to hide the presence of the lead telephone cables and equipment from the Plaintiffs and the public at large. Defendants colluded in order to save money and avoid the consequences of Plaintiffs and the public finding out about the presence of the lead equipment across Louisiana, including the financial risk of having to remove the lead cables and equipment and remediate and restore the contamination of Plaintiff's Properties caused by the lead cables and equipment.

**92.**

Defendants' breaches were in bad faith, and these breaches caused damage to the class members.

3810755v1

31

**93.**

As a result of Defendants' bad faith breach of their servitude obligations, Defendants are liable to class members not only for all damages that are foreseeable under Louisiana Civil Code article 1996, but also for all consequential damages under Louisiana Civil Code article 1997.

**94.**

Defendants are liable to class members for any and all remedies determined to be appropriate by this Court, including but not limited to injunctive relief for removal of the lead cables and equipment, restoration of the Plaintiffs' Properties, and/or monetary compensation in the amount that would compensate Plaintiffs for Defendants' breach of their obligations to remove the lead cables and equipment and remediate the lead contamination on the property.

### COUNT 3: ABUSE OF RIGHT (CLASS COUNT)

**95.**

Plaintiffs incorporate by reference all allegations in the preceding and subsequent paragraphs as if fully set forth herein.

**96.**

The Defendants' abused their right to use Plaintiffs' Properties by leaving lead telecommunications cables and equipment on, or adjacent to, Plaintiffs' Properties long after it was obsolete and by contaminating Plaintiffs' Properties with lead:

- There is no serious or legitimate motive for Defendants to leave the lead cables and equipment in place after new lines were installed.

- Defendants knew that leaving the lead cables and equipment on, or adjacent to, Plaintiffs' Properties would result in contamination and diminution of property values. These actions were in bad faith and against public policy; and

- Defendants' decision to leave the obsolete lead-based equipment on the property was not done for the purpose of installing, constructing, operating, or maintaining a telecommunications network because the network has been upgraded several times with newer, safer cables and associated equipment that do not contain lead.

3810755v1

**97.**

Pursuant to Louisiana Civil Code article 623, "The usufruct may be terminated by the naked owner if the usufructuary commits waste, alienates things without authority, neglects to make ordinary repairs, or abuses his enjoyment in any other manner." Accordingly, in addition to the remedies sought above for breach of contract, the Defendants' abuse of right also allows for the remedy of termination of the telephone rights-of-way. Accordingly, the class members are entitled to the termination of the rights-of-way and restoration and return of their property in the condition it was in at the inception of the rights-of-way.

**98.**

Pursuant to Louisiana Civil Code article 621, "A usufruct terminates by the prescription of nonuse if neither the usufructuary not any other person acting in his name exercises the right during a period of ten years.  This applies whether the usufruct has been constituted on an entire estate or on a divided or undivided part of an estate."

**COUNT 4: TRESPASS (CLASS COUNT)**

**99.**

Plaintiffs incorporate by reference all allegations in the preceding and subsequent paragraphs as if fully set forth herein.

**100.**

The Defendants owed (and continue to owe) a duty to the Plaintiffs not to trespass.

**101.**

Defendants' lead cables and equipment are an unauthorized physical invasion of Plaintiffs' Properties that is considered a trespass.  For example, in many circumstances, Defendants did not have authorization to install the lead cables and equipment on Plaintiffs' Properties because they failed to obtain the proper servitudes or other authority to install the lead cables and equipment on Plaintiffs' Properties. Further, Defendants have no authority to contaminate Plaintiffs' Properties with lead and leave the lead on the property long after the cables have become obsolete. The

3810755v1

offending lead cables and equipment, as well as the contamination that has resulted, are trespassing on Plaintiffs' Properties. This trespass will continue until the offending lead cables and equipment are removed and the contamination is remediated.

102.

Defendants' actions have resulted in environmental contamination of the soil, the surface water on, and the groundwater underlying, Plaintiffs' Properties, which constitutes a trespass.

103.

The ongoing invasion of the Plaintiffs' property rights constitutes a continuing trespass on Plaintiffs' Properties.

104.

Plaintiffs aver that the Defendants' actions have resulted in an encroachment of their property by the (1) unauthorized lead cables and equipment and (2) the contamination resulting from these lead cables and equipment.  This encroachment is a continuous and unlawful invasion of the Plaintiffs' rights. Plaintiffs are entitled to have this trespass abated. The contamination is causing new and ever-increasing damage to Plaintiffs' property, and such damage will continue until the lead cables and associated lead equipment are removed, the contamination is halted, and the contamination is removed.

105.

This trespass will continue day-to-day until the Defendants' offending conduct is abated.

106.

The Plaintiffs aver that they are entitled to compensatory damages because of the Defendants' acts and omissions and are entitled to injunctive relief in the form of removal of the lead cables and equipment, as well as restoration of the land, water, and groundwater.

107.

Further, the Defendants' trespasses were conducted in legal and moral bad faith as they acted with reckless indifference and in wanton disregard of the Plaintiffs' property rights. Accordingly, Plaintiffs are entitled to disgorgement of the Defendants' revenues because of the Defendants' moral bad faith trespasses.

3810755v1

**108.**

The Plaintiffs desire and are entitled to require the Defendants to return Plaintiffs' Properties to the condition they were in before the unauthorized lead cables and associated equipment were installed and the contamination occurred. In the alternative, the Plaintiffs desire and are entitled to damages to cover the cost of restoring the Properties to their prior condition.

### COUNT 5: NUISANCE (CLASS COUNT)

**109.**

Plaintiffs incorporate by reference all allegations in the preceding and subsequent paragraphs as if fully set forth herein.

**110.**

In addition to the basic Civil Code article 2315-based duties discussed above, Defendants each have the specific duty to Plaintiffs owed to a neighbor under Civil Code articles 667, *et seq.*

**111.**

Defendants' activities have severely deprived Plaintiffs of the enjoyment of their own property, as the ability to enjoy their property as they see fit is wholly undermined by the presence of lead cables and equipment on, or adjacent to, Plaintiffs' Property and the extraordinary contamination of their property, surface water, and groundwater underlying their property by Defendants' actions.

**112.**

Plaintiffs own properties neighboring the location of Defendants' telecommunications equipment.

**113.**

Defendants knew or should have known that their activities would cause the damage to Plaintiffs' Properties. This includes, but is not limited to, Defendants' failure to remove the offending lead cables and equipment and restore the property that has been contaminated.

**114.**

Defendants have breached their vicinage duties to Plaintiffs under Civil Code article 667.

**115.**

The breach of these duties has caused damage to Plaintiffs because of the presence of lead cables and equipment on, or adjacent to, Plaintiffs' Properties and the extraordinary contamination of their properties, surface water, and groundwater underlying their Properties by Defendants' actions. Defendants are therefore liable for all damages and remedies detailed further below.

**GROUND WATER ACT AND REMEDIES AND EXEMPLARY DAMAGES**

**116.**

Plaintiffs incorporate by reference all allegations in the preceding and subsequent paragraphs as if fully set forth herein.

**117.**

Defendants are liable to provide a full cleanup of the properties of Plaintiffs and all those similarly situated as required under the injunctive remedies under LEQA.

**118.**

Pursuant to the Louisiana Ground Water Act, Defendants are liable to fund the "most feasible plan" to "evaluate or remediate the contamination and protect the usable ground water consistent with the health, safety, and welfare of the people." La. R.S. § 30:2015.1.

**119.**

In addition to groundwater remedies, Defendants are liable to Plaintiffs for compensatory damages for the cost to fully remediate the soil and surface water on the Plaintiffs' Properties, to restore the Plaintiffs' properties to the condition they were in prior to the contamination caused by Defendants' lead cables and equipment.

**120.**

Defendants are liable for all costs and expenses, including expert witness fees and reasonable attorneys' fees, incurred by Plaintiffs to remedy the contamination of their properties by Defendants, pursuant to the Louisiana Ground Water Act and under any other applicable law.

**PRAYER FOR RELIEF AND JURY DEMAND**

WHEREFORE, Plaintiffs demand judgment against Defendants, providing the following relief:

3810755v1

(a) Class certification of the class of Plaintiffs as alleged herein;

(b) Injunctive relief requiring removal of the lead telecommunications cables and equipment on, or adjacent to, Plaintiffs' Properties, as well as remediation of the soil, surface water, and groundwater on and underlying the Plaintiffs' Properties;

(c) Compensatory damages to be determined at trial, including for the cost to (1) remove the lead telecommunications cables and equipment on, or adjacent to, Plaintiffs' Properties; (2) remediate the Plaintiffs' Properties and (3) for any diminution of value of the Plaintiffs' Properties;

(d) Injunctive relief requiring the prevention of any further migration of hazardous substances or any other pollutants from Defendants' property onto or underneath the Plaintiffs' Properties;

(e) Civil Penalties as provided for under any applicable law;

(f) Exemplary damages as provided for under any applicable law;

(g) Attorneys' fees, expert costs, and all other expenses allowed under the Louisiana Ground Water Act, an/or any other applicable law;

(h) Injunctive relief, damages, and civil fruits from the bad faith trespass by Defendants onto the Plaintiffs' Properties;

(i) Pre-judgment and post-judgment interest to the maximum extent and at the maximum interest allowed by law; and

(j) Such other relief as the Court determines to be appropriate under law and equity.

Finally, Plaintiffs demand that this case be tried to a jury.

Respectfully submitted,

Blair Schilling (LA Bar No. 35308)
James R. Swanson (LA Bar No. 18455)
Kerry J. Miller (LA Bar. No. 24562)
Lance C. McCardle (LA Bar. No. 29971)
H.S. Bartlett III (LA Bar. No. 26795)
Paul C. Thibodeaux (LA Bar. No. 29446)
FISHMAN HAYGOOD, LLP
201 St. Charles Avenue, Suite 4600

3810755v1

A FACSIMILE OF THIS PLEADING **RECEIVED AND FILED**
WAS RECEIVED AND FILED ON

37   NOV 02 2023             NOV 06 2023

Dy. Clerk of Court

New Orleans, Louisiana 70170
Telephone: (504) 586-5252
Facsimile: (504) 586-5250
Email: bschilling@fishmanhaygood.com
jswanson@fishmanhaygood.com
tbartlett@fishmanhaygood.com
lmccardle@fishmanhaygood.com
kmiller@fishmanhaygood.com
pthibodeaux@fishmanhaygood.com

Bernard E. Boudreaux, Jr. (LA Bar No. 02219)
JONES, SWANSON, HUDDELL, L.L.C.
301 Main Street, Suite 1920
Baton Rouge, Louisiana 70801
Telephone: (225) 810-3165
Facsimile: (225) 810-3169
Email: bboudreaux@jonesswanson.com

Gladstone N. Jones, III (LA Bar No. 22221)
Kevin E. Huddell (LA Bar No. 26930)
John T. Arnold (LA Bar No. 31601)
Michael P. Arata (LA Bar No. 21448)
JONES, SWANSON, HUDDELL, L.L.C.
601 Poydras Street, Suite 2655
New Orleans, Louisiana 70130
Telephone: (504) 523-2500
Facsimile: (504) 523-2508
Email: gjones@jonesswanson.com
khuddell@jonesswanson.com
jarnold@jonesswanson.com
marata@jonesswanson.com

*Counsel for the Plaintiffs*

A FACSIMILE OF THIS PLEADING
WAS RECEIVED AND FILED ON

NOV 02 2023

RECEIVED AND FILED

NOV 06 2023

Dy. Clerk of Court

3810755v1

38

**PLEASE SERVE**

AT&T, CORP.
*Through its registered agent*
CT Corporation System
3867 Plaza Tower Drive
Baton Rouge, LA 70816

BELLSOUTH TELECOMMUNICATIONS, LLC d/b/a AT&T LOUISIANA
*Through its registered agent*
CT Corporation System
3867 Plaza Tower Drive
Baton Rouge, LA 70816

LUMEN TECHNOLOGIES, INC. d/b/a CENTURYLINK, INC.
*Through its registered agent*
CT Corporation System
3867 Plaza Tower Drive
Baton Rouge, LA 70816

CENTURYLINK COMMUNICATIONS, LLC
*Through its registered agent*
CT Corporation System
3867 Plaza Tower Drive
Baton Rouge, LA 70816

**THE FOLLOWING DEFENDANTS WILL BE SERVED PURSUANT TO THE
LOUISIANA LONG-ARM STATUTE**

AT&T, INC.
*Through its registered agent*
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

VERIZON COMMUNICATIONS, INC.
*Through its registered agent*
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

A FACSIMILE OF THIS PLEADING
WAS RECEIVED AND FILED ON

NOV 02 2023

RECEIVED AND FILED

NOV 06 2023

Dy. Clerk of Court

3810755v1

39

16th JUDICIAL DISTRICT COURT FOR THE PARISH OF ST MARY

STATE OF LOUISIANA

No. _____ 1 3 7 9 3 5

SECTION _____ DIV. "G"

GARY BLUM AND LUCIA BILLIOT
individually and as representatives of all those similarly situated,

Plaintiffs

VS.

AT&T, CORP.; AT&T, INC.; BELLSOUTH TELECOMMUNICATIONS, LLC d/b/a AT&T
LOUISIANA; VERIZON COMMUNICATIONS, INC.; LUMEN TECHNOLOGIES, INC.
d/b/a CENTURYLINK, INC.; CENTURY LINK COMMUNICATIONS, LLC,

Defendants

---

**VERIFICATION**

---

STATE OF LOUISIANA
PARISH OF ORLEANS

Before me, the undersigned notary public in and for this parish and state, personally came
and appeared E. Blair Schilling in her capacity as Counsel for the Plaintiffs, who upon being sworn,
did depose and state that he has read the above and foregoing Petition in its entirety; that she is
personally familiar with the facts stated and alleged herein; and that she verifies that the facts of
this Petition are true and correct to the best of his knowledge, information, and belief.

E. Blair Schilling

SWORN TO AND SUBSCRIBED
BEFORE ME THIS 2nd DAY
OF NOVEMBER, 2023

NOTARY SIGNATURE

3810755v1

A FACSIMILE OF THIS PLEADING
WAS RECEIVED AND FILED ON

NOV 02 2023

RECEIVED AND FILED

NOV 06 2023

Dy. Clerk of Court

40

UNITED STATES OF AMERICA,
STATE OF LOUISIANA,
16TH JUDICIAL DISTRICT COURT,
PARISH OF ST. MARY

I, **CLIFF DRESSEL**, Clerk, 16th Judicial District Court, St. Mary Parish, Louisiana ex Officio Recorder thereof, duly commissioned and qualified, do hereby certify that the above and foregoing is a true and correct copy of **Citation and Petition issued in the proceeding captioned: Gary Blum, Et al vs AT & T Corp., Et al Vs. No. 137935 Div. "G" State of Louisiana, Parish of St. Mary.**

IN EVIDENCE WHEREOF, witness my official signature, and the impress of the seal of my office at Franklin, St. Mary Parish, Louisiana, _____**November 7, 2023**_____.

_____
CLERK, SIXTEENTH JUDICIAL DISTRICT COURT,
ST. MARY PARISH, LOUISIANA

I, _____**Anthony J. Saleme, Jr.**_____, Judge of the Sixteenth Judicial District Court, in and for the Parish of St. Mary, State of Louisiana, do hereby certify that **Cliff Dressel**, is the Clerk of said Court, that the same is a Court of Record, and that the signature, **Cliff Dressel**, Clerk, Sixteenth Judicial District Court, St. Mary Parish, Louisiana, to the foregoing certificate is in the proper handwriting of him, the said **Cliff Dressel**, Clerk, to which official act as such full faith and credence are due and owing, and I do further certify that this attestation is in due form of law.

IN EVIDENCE WHEREOF, witness my official signature at Franklin, Parish of St. Mary. Louisiana, _____**November 7, 2023**_____.

_____
JUDGE, SIXTEENTH JUDICIAL DISTRICT COURT
ST. MARY PARISH, LOUISIANA.

I, CLIFF DRESSEL, Clerk, 16th Judicial District Court, St. Mary Parish, Louisiana, duly commissioned and qualified, do hereby certify that Honorable _____**Anthony J. Saleme, Jr.**_____, who signed the foregoing certificate is now and was at the time of signing same, the presiding Judge of the Sixteenth Judicial District in and for the Parish of St. Mary, Louisiana, duly elected and commissioned and qualified as such, and that said attestation is in due form of law.

IN EVIDENCE WEREOF, witness my official signature, and the impress of the seal of my office, at Franklin, St. Mary Parish, Louisiana, _____**November 7, 2023**_____.

_____
CLERK, ST. MARY PARISH, LOUISIANA

Revised 02/2017