## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | |
|---|---|
| **GARY BLUM AND LUCIA BILLIOT** | Case No. 6:23-cv-1748-RRS-CBW |
| **v.** | Judge Robert R. Summerhays |
| **AT&T CORP, AT&T INC., BELLSOUTH TELECOMMUNICATIONS, LLC d/b/a AT&T LOUISIANA, VERIZON COMMUNICATIONS INC., LUMEN TECHNOLOGIES, INC. f/k/a CENTURYLINK, INC., CENTURYLINK COMMUNICATIONS, LLC** | Magistrate Judge Carol B. Whitehurst |

---

### AMENDED AND RESTATED CLASS ACTION COMPLAINT

---

INTO COURT, through undersigned counsel, comes GARY BLUM and LUCIA BILLIOT, on behalf of themselves and others similarly situated, who file this Class Action Petition against AT&T, Corp., AT&T, Inc., BellSouth Telecommunications, LLC d/b/a AT&T Louisiana, Verizon Communications, Inc., Lumen Technologies, Inc. f/k/a CenturyLink, Inc, and CenturyLink Communications, LLC.  In support of these claims, Plaintiffs allege as follows:

### PARTIES

***Plaintiffs***

### 1.

Plaintiffs, GARY BLUM and LUCIA BILLIOT are Louisiana citizens who own properties affected by the Defendants' conduct in Louisiana.

**2.**

**Plaintiff Class.** The Named Plaintiffs herein propose to proceed on behalf of a class of persons defined as follows:

> *All natural and juridical persons (excluding any state agencies or commissions, and excluding the U.S. federal government and any agencies or departments thereof) who own immovable property in Louisiana that has been damaged by Defendants' lead-covered telephone cables and associated lead equipment.*[1]

Excluded from the Class are the Judge to whom this case is assigned and his or her immediate family. The Plaintiffs reserve the right to revise the definition of the Class based on information learned through discovery.[2]

### *Defendants*

**3.**

**Defendant AT&T Corp.** is a New York Corporation having its principal place of business in Bedminster, New Jersey.

**4.**

**Defendant AT&T Inc.** is a Delaware Corporation having its principal place of business in Dallas, Texas.  AT&T Inc.'s common stock trades on the New York Stock Exchange under the ticker symbol "T."

**5.**

**Defendant BellSouth Telecommunications, LLC d/b/a AT&T Louisiana** is a Georgia limited liability company having its principal place of business in Georgia.  On information and

---

[1] Plaintiffs specifically exclude personal injury damages from the class claims and relief sought.
[2] The individually named plaintiffs and the putative class members are hereinafter collectively referred to as "Plaintiffs."

belief, the sole member of BellSouth Telecommunications, LLC is BellSouth, LLC. BellSouth, LLC is a Georgia limited liability company whose sole member is AT&T DataComm, L.P. AT&T DataComm, L.P. is a Delaware limited partnership whose partners consists of by AT&T DataComm Holdings, LLC (99.99% limited partner) and BellSouth Mobile Data, Inc. (0.01% general partner). AT&T DataComm Holdings, LLC is a Delaware limited liability company, whose sole member is BellSouth Mobile Data, Inc., a Georgia corporation incorporated and with its principal office in Georgia. The parent company of BellSouth Mobile Data, Inc. is AT&T Inc., a Delaware corporation. AT&T Inc.'s common stock trades on the New York Stock Exchange under the ticker symbol "T."

## 6.

**Defendant Verizon Communications, Inc.** is a Delaware Corporation having its principal place of business in New York, New York. Verizon's common stock trades on the New York Stock Exchange under the ticker symbol "VZ."

## 7.

**Defendant, CenturyLink Communications, LLC** is a Delaware limited liability company having its principal place of business in Louisiana. On information and belief, CenturyLink Communications, LLC's sole member is Lumen Technologies, Inc., which is a Louisiana corporation having its principal place of business in Monroe, Louisiana.

## 8.

**Defendant Lumen Technologies, Inc.** is a Louisiana corporation having its principal place of business in Monroe, Louisiana. Lumen Technologies, Inc.'s common stock trades on the New York Stock Exchange under the ticker symbol "LUMN."

**9.**

Defendants are jointly and solidarily liable for the damages to Plaintiffs.

## ALLEGATIONS

**A.        The Early Days of AT&T in Louisiana.**

**10.**

The Bell System's history stretches back to its founder Alexander Graham Bell's invention of the telephone. In 1877, the patent holders of the telephone formed Bell Telephone Company. In 1899, the American Telephone and Telegraph Company (AT&T) became the parent company of the Bell System. Among the lines of business held by AT&T was the AT&T long distance service lines and the regional Bell operating companies.

**11.**

In 1894, the original patents expired and 6,000 new independent telephone carriers sprang up overnight. Amassing two million subscribers in ten years, independent carriers shot past Bell Telephone's 1.3 million subscribers. By 1903, independent carriers serviced over 6,000 exchanges to Bell Telephone's only 1,500.

**12.**

Southern Bell Telephone & Telegraph Company ("Southern Bell") was based out of Atlanta, Georgia and serviced many customers in Louisiana. In the early 1900s, AT&T started purchasing competitors, which attracted the attention of antitrust regulators and prompted the requirement that AT&T obtain approval from the Interstate Commerce Commission before acquiring more independent telephone companies. Among these acquisitions was Cumberland

Telephone & Telegraph Company, which also serviced customers in Louisiana, and was merged into Southern Bell.

**13.**

In Louisiana, Huey Long accused Southern Bell-Cumberland of manipulating the telephone lines to shove through a rate hike of 100 percent on long distance calls in Louisiana. Southern Bell-Cumberland convinced the commissioners of the Louisiana Railroad Commission (later renamed the Public Service Commission) that the rate increases were necessary. But when publicly-traded AT&T published astronomical profits and salaries, people were outraged. The board of directors had authorized $90 million in new stock to 151,000 shareholders who had already held nearly a billion dollars' worth.

**14.**

In Louisiana, from 1915 to the first half of 1920, Southern Bell-Cumberland installed a net average annual gain of 2,103 telephones. By 1919, installations shot up 600 percent to 13,850 telephones, overloading switchboards and forcing hasty construction of thousands of miles of new wire. Cumberland Telephone in Louisiana recorded 1,771,467 toll phone calls in 1915, but by 1920 the company handled that many calls in just the first five months of the year.

**15.**

Southern Bell-Cumberland asked for yet another rate hike. Two Commissioners granted the increase in February 1921. Huey Long voted against it, writing in his dissent:

> Cumberland admits that 99 percent of its stock is owned by the Bell and that 100 percent of the Bell is owned by American Telephone & Telegraph Company, and the latter concern owns the stock of a great majority of the telephone companies in the nation, which, when all combined, are sometimes almost called a monopoly… A mere corporate fiction prevents calling these concerns one and the same company

5

and there is no reason why this fiction should be swept aside…It is not proper to impose an added burden upon a public struggling under recent economic reverses.

**16.**

In the 1920s Southern Bell installed 70 miles of long distance copper telephone wire from Monroe, Louisiana to El Dorado, Arkansas. Heavy copper grounding wires sheathed in lead ran into the ground to channel lightening strikes and to enable better electrical flow for clearer communication. In drought subscribers had to pour water around the ground wire to make a call.

**17.**

In 1923, Huey Long, now chairman of the Louisiana Railroad Commission, successfully rolled back the 1920 rate hike by nearly 70 percent. The rate reduction and rebate to customers created a boon for Southern Bell-Cumberland. Linemen couldn't install telephones fast enough. "Wherever your thought goes, your voice may go," boasted Southern Bell-Cumberland's ads. "Your telephone is the latch to open for you any door in the land," announced another ad. Of Louisiana's 7,000 Southern Bell-Cumberland's installations in 1923, Monroe, Louisiana accounted for 2,036. Southern Bell-Cumberland crowed of its $1.7 million investment in Louisiana, 3,800 new poles, 50 railcar loads of cable, nine carloads of copper wire.[3]

**18.**

In 1925, Southern Bell-Cumberland reported on its expansion in Louisiana—which received "a substantial share of [the] growth and of [the] expenditure in 1924"—highlighting the network of "new poles, cable, copper wire, iron wire and underground conduit" it had laid in the

---

[3] *The Monroe News-Star*, January 22, 1924, page 5.

previous year, and further noting that the bulk of this extensive system remains out-of-sight for the average subscriber:



**19.**

Records were broken every day as Louisiana operators connected 264,376,000 local calls and 3,074,750 long distance calls. Considering Monroe's huge natural gas field, Southern Bell's statisticians projected that Monore and West Monroe would grow from 18,000 in 1924 to 48,000 by 1944. Southern Bell-Cumberland planned a $20 million investment over five (5) years.  The

company's Dow Jones Industrials climbed at breakneck speeds. Southern Bell moved O.H. Bynum up and J.W. Warren in as manager of the Monroe, Louisiana office.

**20.**

In the mid-1940s, Southern Bell-Cumberland won a rate increase and extended telephone lines by 26 miles and 380 poles, coving two-thirds of Morehouse Parish.

**B.     The Dawn of What Would Become CenturyLink and Lumen.**

**21.**

When the Great Depression hit in 1932, independent telephone companies were in trouble. William Clarke Williams and his wife Marie Williams had been working for Southern Bell-Cumberland for many years, and they decided to take their savings and try their hand at owning their own telephone company. They bought Oak Ridge Telephone Company, which at the time served 72 customers.  The price: $500. The Williams' son, Clarke McRae Williams,  would later become the father of CenturyTel, Inc., the predecessor to CenturyLink and Lumen. [4]

**22.**

In 1946, Mr. and Mrs. Williams gave the family's telephone company to their son Clarke. The Oak Ridge network was in need of significant repairs, and Clarke had to replace the entire network, laying new copper and steel wire sheathed in lead, replacing poles, conduit, and installing lead slice boxes were all needed.

**23.**

In 1947, Clarke Williams bought Marion Telephone Company in Marion, Louisiana for $5,000. Soon thereafter, Clarke also bought an exchange in Choudrant, Louisiana, a few miles west of West Monroe, Louisiana. In September 1948, Clarke bought Plain Dealing Telephone

---

[4] Clarke Williams, Sr. interview, KNOE Special Report with James Patrick, KNOE TV8 News, © Noe Enterprises, Inc.

Company, which sits above Shreveport, Louisiana on the Texas line. With the four companies in hand, Clarke and his partners pulled all of the networks under one umbrella and called themselves United Telephone Company. All of the networks needed replacement wires, insulators, conduits, poles, etc.

## 24.

At the same time, the Conrad family, which owned Breaux Bridge Telephone Company next to the Bell Company in Lafayette, Louisiana, was hard at work buying up five independent telephone exchanges in the heart of Louisiana's Cajun country.  Around 1950, Clarke Williams bought the now consolidated Breaux Bridge Telephone Company, doubling the size of United Telephone Company.  The 1950s brought more transitions and consolidations in the telephone industry.

## 25.

In 1968, Clarke Williams reincorporated all of his companies, including those that were part of United Telephone Company, into Central Telephone & Electronics Corporation.

## 26.

In August 1971, General Telephone Company of the Southwest and Four States Telephone Company entered into an agreement to sell all of their respective telephone properties located in the State of Louisiana to Century Telephone Enterprises, Inc. (or a corporate subsidiary of the same) for a purchase price of $16,500,000.  In partial satisfaction of this contract, on March 1, 1972, General Telephone Company of the Southwest transferred assets located in St. Landry, Parish to Evangeline Telephone Company.  Evangeline Telephone Company was a subsidiary of Century Telephone Enterprises. Similarly, in partial satisfaction of the August 1971 agreement, General Telephone Company of the Southwest transferred assets located in Webster Parish,

Louisiana to Caddoan Telephone Company.  Caddoan Telephone Company was a subsidiary of Century Telephone Enterprises. In March 2972, Four States Telephone transferred assets to Louisiana Western Telephone Co. in Allen Parish.  Louisiana Western Telephone Company was a wholly owned subsidiary of Century Telephone Enterprises.  By 1972, Century Telephone, with Clarke Williams still at the helm, was operating approximately 132,000 stations, ranking it among the top ten independent telephone companies in the United States.

### C.     The Great Bell Breakup.

#### 27.

In 1984, by agreement between AT&T and the U.S. Department of Justice, the Bell System was broken up into eight (8) companies.   the local operating companies were divided into independently owned regional holding companies, dubbed the "Baby Bells."  In the outfall of the Great Bell Breakup, all of Defendants' predecessors acquired assets and liabilities of Baby Bells.

**28.**



**29.**

Central Telephone & Electronics Corporation later changed its name to Century Telephone Enterprises, Inc. in 1971, and then was called CenturyTel, Inc. from 1999-2010. In 2009, CenturyTel acquired Embarq Corporation—the successor to United Telephone Company—in a $5.8 billion dollar deal.  The company changed its name to CenturyLink, Inc. in 2010.  In September 2020, CenturyLink changed its name to Lumen Technologies, Inc.

**30.**

On June 30, 2000, Bell Atlantic merged with GTE, Corp. to form Verizon. GTE Corp.'s predecessors owned, operated, and used a vast copper wire network.  In 1934, General Telephone Company was established.  In 1959, General Telephone Company merged into General Telephone

and Electronic Corporation. General Telephone Company owned and operated a lead-sheathed copper telephone network in Louisiana.

**31.**

The ownership and usage of the lead-based telecommunications systems in Louisiana have been crisscrossed between Defendants since the industry's inception. Assets are regularly swapped, and networks and the associated equipment are transferred or sold and then resold back to the previous owner or a related entity. Not only have the telecommunications assets been passed like hot potatoes between the Defendants throughout Louisiana, but Defendants also use the other Defendants' networks, whereby each company profits and the customers are charged toll or a higher rate to account for the use of another Defendants' network. Defendants are solidarily liable for the damages alleged herein due to, among other reasons, their intermingled and shared ownership and usage of the lead-based telecommunications system in Louisiana. Louisiana law provides that Defendants are solidarily liable to the putative class members.

**D.    The telephone industry used lead to construct their copper wire networks.**

**32.**

As early as 1891, lead-covered, paper insulated copper wires were being used by the telephone industry. In 1912 a new 1% antimony, 99% lead alloy was developed for cable sheaths. This material was less expensive than the lead tin alloy pipes, it had good tensile strength, corrosion resistance, and mechanical properties helpful for aerial and underground cables. Lead was not the only option. Other metals could have been used by the telephone industry, but they would have been more expensive.

12

**33.**

Lead pipe was first used as the cable's "outer jacket" or sometime referred to as conduit. Conductors were pulled into the lead pipe, which was hammered down to size over the conductors. Lead pipe allowed the use of pulp and paper insulation for the conductors.

**34.**

In the late 19th century, companies began using cables containing bundles of copper wire that delivered more capacity and better transmission than single wire connections. Sheathing the cable in lead cut electromagnetic noise in the wires and kept water out. By 1940, the majority of the phone network was made up of lead-covered cables and associated equipment, such as lead-covered splice boxes.[5]

**35.**

Lead could be spread directly over the cable assembly, speeding up the manufacturing process. Problems with lead sheathing resulted from moisture intrusion. Cable repair personnel were called in to locate the sheath break and to repair the pairs damaged by the moisture intrusion. Once they opened the lead sheath, the defective pairs were dried and then spliced to remove the defective section of conductor. It was accomplished by splicing in a small section of individual conductor between the interrupted point(s) of an affected conductor. The bare copper conductors (approximately 2 inches) were twisted together by hand, or soldered. A paper/cotton sleeve was then placed over the twisted conductor. The sleeve was then folded back in half, stabilizing the splice and preventing sleeve displacement. Splice boxes were also covered in lead.

---

[5] Shalini Ramachandran, et al. *What AT&T and Verizon Knew About Toxic Lead Cables*, WALL ST. J. (Jul. 12, 2023), *available at* https://www.wsj.com/articles/att-verizon-lead-cables-telecom-5e329f9?mod=hp_lead_pos7.

**36.**

The copper telephone cable network was wrapped in lead and covered by steel cords for protection.



**37.**



The following  photo caption was provided by former the Bell System Splicer who is

pictured regarding the splicing process and the use of lead in the process:

> I am the last generation of Splicers that hand spun wires. The Splicer in the Manhole
> picture is beginning a random splice. The only sequential order in randoming is
> bunch (usually 100 pairs) identification. The core bunch is number one and rotation
> follows the rule "clock to the block" and counter clockwise to the C.O. The white
> sleeves on the left side are placed first on all the pairs. When the pair is spun,
> trimmed off, and folded back into the now straight wire the sleeve is slid forward
> to cover the exposed copper that is shorter in length than the waxed sleeve. After
> all the random splices are completed we would then test and identify each pair for
> termination purposes at each end of the 'run.' The Splicers Trailer is commonly
> know as a Tool Cart. ***The center fold-down door in the middle became a work
> bench which we prepared lead sleeves to be 'lead wiped' and create an airtight***

*splice enclosure*. Underground cables are pressurized to trigger an alarm if a leak develops.

- Tom Steed, Mid Hudson (NY) Cable Maintenance[6]

**38.**

"The oldest cables are typically at the bottom of a manhole or conduit, said retired AT&T executive Bill Smith.[7]

**39.**

AT&T admits in its own statements that the United States Telecommunications industry only started to phase out lead-clad telecom cables in the 1950s and that lead-clad cables were foundational to the growth of the telephone networks.[8] "Lead-clad cables make up a small percentage of our network infrastructure today. We estimate that lead-clad cables represent less than 10% of the copper footprint, and many of the cables remain in active service. More than two-thirds of lead-clad cabling is either buried or in conduit, followed by aerial cable, and with a very small portion running underwater. Generally, the U.S. telecommunications industry phased out the placement of new lead-clad telecom cables in the 1950s, after developing a new type of sheathing to protect the interior copper."

**40.**

By 1956, the Bell System was using around 100 million pounds of lead a year, according to a Bell document.  As the Wall Street Journal observed, "[t]hat's heavier than more than 6,660 male African elephants."[9]  Even after the lead cables and associated lead equipment were phased

---

[6] https://memorial.bellsystem.com/images/edward_kelly_photos/splicing_cable_in_manhole.gif; https://memorial.bellsystem.com/text/cable_splicing.txt.
[7] Ramachandran, et al., *supra* note 5.
[8] *The Facts About Lead-Clad Cables*, AT&T, *available at* https://about.att.com/pages/legacy-cables.
[9] Ramachandran, et al., *supra* note 5.

out for plastic sheathing of fiber optic cables, the lead copper network remained in place and was not removed.

**41.**

The existence of lead cables within the Bell System is undeniable.  On December 29, 1978, AT&T and associated Bell System companies petitioned OSHA to reconsider the OSHA Lead Standard. This "Petition for Reconsideration" was submitted in an OSHA proceeding styled, "*In the Matter of Promulgation of Final Standard on Occupastional Exposure to Lead (29 CFS S 1919.1025)*" and was directed to the Assistant Secretary of Labor for Occupational Safety and Health.  It was signed by James A. BeBois, Charles G Hollins, and Frank R Saunders of AT&T.

**42.**

AT&T's 1978 OSHA Petition for Reconsideration acknowledged AT&T's ownership of lead cables: "**There are millions of poles carrying lead cable**, and often cable is accessed in the span between poles, hence signs posted at each pole would not even address the cable in these locations.  **There are some 700,000 manholes in the Bell System many of which house lead cables**."

**43.**

The Petition for Reconsideration further admitted that new lead sheathed cables were still being placed into service as late as 1978 and AT&T committed to removing and recycling the cables and metals in the future:

> **Petitioners' use of lead products has been primarily in the form of lead-sheathed cables and the various lead sleeves and solders necessary to make moisture and airtight the entire cable from end to end. Very little new lead-sheathed cable is placed in service today.  However, the existing lead sheathed cables must be maintained.  Ultimately, these cables will be removed and the metals recycled.  The maintenance and on-going removal of these facilities require that technicians work with the lead from time to time as well as work**

17

**in the vicinity of lead at other times even though the lead-sheathed cable is not actually involved.**

**44.**

Verizon's CEO, Tony Skiadas admitted that Verizon has lead-sheathed cables. "We still have some legacy lead sheath cable in our copper network. As a result of the age of this infrastructure and the history of the industry, records are incomplete as to exactly how much of the cable at our network has led sheathing," he said. "However, to give you a sense of the scale of the infrastructure we are talking about, our copper network is comprised of less than 540,000 miles of cable, roughly half of which is aerial, and lead sheath cable makes up a small percentage of our copper network. This number excludes the network elements previously owned by MCI and XO Communications because we are still reviewing the historical records of those companies."

**45.**

Lumen has also admitted that there are still 35,000 miles of lead-covered cables in its network. To put those numbers into perspective, that is enough lead-covered cables to wrap around the entire Earth almost one and a half times. The federal government has issued Lumen ten "serious" citations for exposure to excessive levels of lead by its frontline workers, causing Lumen to enter into a nationwide lead abatement program. Frontline workers for Lumen reported its copper line network was in a state of disrepair. Lumen, for years, has reported its disposal of lead as a "hazardous waste."

**46.**

On August 1, 2023, Chris Stansbury, Lumen's current CFO, addressed investors and stated, "We began phasing out lead sheet cables from our network infrastructure during the 1950s. And based on our initial analysis, we currently estimate that less than 5% of our approximately 700,000-

18

mile copper network contained lead, of which we believe the majority is buried in conduit-based infrastructure."

**47.**

In 2017, Lumen acquired Level 3 Communications, Inc. in a transaction valued at $34 million.  The following map, published by Lumen, shows in green the areas serviced by traditional copper wire cable lines owned by CenturyLink and Level 3.[10]



**48.**

On December 31, 2022, Lumen reported that, in addition to the 160,000 commercial buildings that are directly connected to its fiber network, "approximately 3.1 million" of the 21.8 million residential units serviced by its network "were capable of receiving services from our fiber-based infrastructure, with the remainder connected with copper-based infrastructure."  In other words, **approximately 18.7 million, or 85 percent, of the 21.96 million units connected to its network were serviced through its legacy copper-wire system.**

---

[10] *CenturyLink and Level 3 Network Map*, ATC, *available at* https://4atc.com/centurylink-level-3-network-map/ (last visited Dec. 6, 2024).

**49.**

Lumen has acknowledged the need to remove lead sheathed cables. On or around July 28, 2016, CenturyLink extended a contract that Qwest has with Maricopa, County, Arizona, which includes the city of Phoenix, in which endorsed the fact that "**[h]istorically, telecommunications facilities have used lead sheathed cables in downtown core environmen**ts" and, as a result, "**Contractor [CenturyLink] has developed a replacement process…to remove lead sheathed cable" when necessary**."

**50.**

Defendants have abandoned their lead-sheathed copper lines.  For example, by 2018, Lumen announced "[w]e no longer report or discuss access lines as a key operating metric given the significant migration in our industry from legacy services to IP-enables services," including fiber. As copper lines—most of which were encased with lead—became obsolete and other safer options were developed, Defendants should have removed and replaced the lead-sheathed wires with safer options and remediated the lead in the environments caused by the lead-sheathed lines. Defendants failed to do so, opting instead to simply upgrade its customers to new technology, while leaving the old lead-sheathed cables in place. These lead cables hang aerially on utility poles above densely populated areas frequented by adults and children alike, are sticking out of the ground in yards, parks, sidewalks, and other heavily trafficked areas, remain in man holes, or are buried, either directly, in conduits, or underwater.   The decision to leave the cables in place was not about safety; it was a financial decision. Simply put, it is cheaper to leave the lead-sheathed cables in place than to remove them.

**51.**

Frontline workers and unions for the Defendants have reported that they were exposed to significant lead hazards while working for Defendants without adequate protections and in violation of the law.

**52.**

Industry groups that Defendants belong to have been sounding the alarm about lead-sheathed telecommunications equipment for years.

**53.**

Defendants have each either owned, operated, or used lead-sheathed cables, conduit, or associated equipment across the State of Louisiana. Defendants' lead legacy in Louisiana remains to this day.

**E.    Defendants have left behind a sprawling network of lead telecommunications cables and equipment.**

**54.**

Defendants have left behind an extensive network of lead-covered cables and other associated lead equipment stretching across Louisiana. Defendants' profit-driven decision to leave these dangerous lead-covered cables and associated lead equipment in place was made even though the cables and associated equipment have, in whole or in large part, become obsolete and have been replaced by several newer, safer generations of telecommunications cables and equipment.

**55.**

Defendants' decision to line their own pockets by leaving the leaden cables and equipment strewn all over Louisiana has caused significant damage to property across Louisiana and is a violation of the law.

**56.**

Defendants own and/or operate the lead-covered cables and equipment and are responsible for their removal and for restoration of the property damage that the lead cables and equipment have caused, including soil and water contamination.

**57.**

Defendants' predecessors installed the majority of the lead-covered cables and equipment prior to the 1970s.

**58.**

When technology advanced, Defendants and their predecessors upgraded the telephone lines by installing new ones, first utilizing plastic sheathed lines and, later, fiber optic lines, as the industry standard for telephone cables and equipment.

**59.**

On information and belief, Defendants used the new technologies to install plastic-sheathed lines across Louisiana in the 1980s and/or 1990s. Later, in the 2000s, Defendants installed the newest advancement in telecommunication equipment—fiber optic cables—across Louisiana. Despite these advancements and Defendants' installation and use of multiple upgraded telephone networks across Louisiana, Defendants made the decision to leave the degraded and largely obsolete lead-covered cables and associated lead equipment in the ground and on the surface all over Louisiana.

**60.**

Defendants have known for decades that the lead-covered cables and associated equipment should be removed and that the cables posed an environmental hazard to people, animals, and property.  But instead of removing the lead cables and equipment or warning the public about the presence of lead on property across the United States, Defendants kept silent in the hopes that this unknown source of lead contamination would remain undiscovered and that they would not have to pay to remove it.  And, in fact, due to Defendants' concerted actions to keep these sources of lead a secret, for many decades the lead telecommunications cables and equipment went undiscovered.

**61.**

It was not until the *Wall Street Journal* revealed its extensive investigation in July 2023 that this "hidden source of contamination" was brought to light.[11]

**62.**

The *Wall Street Journal* reporters visited approximately 300 sites, collecting around 200 environmental samples from nearly 130 of those sites.[12]  The lead cables were found near and under water, in the soil, and hanging overhead near bus stops and playgrounds.[13] "Roughly 330 of the total number of underwater cable locations identified by the *Journal* are in a 'source water protection area,' designated by federal regulators as contributing to the drinking-water supply, according to an EPA review performed for the Journal."[14]

---

[11] Susan Pulliam, et al., *America is Wrapped in Miles of Toxic Lead Cables*, WALL ST. J. (Jul. 9, 2023), *available at* https://www.wsj.com/articles/lead-cables-telecoms-att-toxic-5b34408b.
[12] *Id.*
[13] *Id.*
[14] *Id.*

**63.**

The *Wall Street Journal's* investigation was detailed and involved collecting and reviewing thousands of records and taking hundreds of samples: "To track the underwater cables, the *Journal* collected more than 40,000 pages of records from federal and state government offices, including applications to the U.S. Army Corps of Engineers to install the cables…"[15]

**64.**

The *Wall Street Journal* reported:

Lead levels in sediment and soil at more than four dozen locations tested by the *Journal* exceed safety recommendations by the U.S. Environmental Protection Agency. At the New Iberia fishing spot, lead leaching into the sediment near a cable in June 2022 measured 14.5 times the EPA threshold for areas where children play. 'We've been fishing here since we were kids," said Tyrin Jones, 27 years old, who grew up a few blocks away.[16]

**65.**

According to the *Wall Street Journal*, the lead cables are a "relic of the Old Bell System's regional telephone network."  "The cables, often contained hundreds of bundled copper wires, had a thick jacket of lead for insulation, to prevent corrosion and to keep out water.  For underwater cables, steel cords sometimes surrounded the lead for further protection. When technology advanced and companies turned to plastic sheathing and, later, fiber optics, they often left the old lines in place."[17]

**F.    Lead is dangerous and lead exposure can result in serious health problems.**

**66.**

Lead is toxic to humans and animals. No amount of lead is safe in the environment. Lead exposure can lead to significant health issues. For example, lead exposure can cause damage to the

---

[15] *Id.*
[16] *Id.*
[17] *Id.*

central nervous system, kidney problems, neurological problems, cardiovascular problems, lung disease, reproductive problems, cancer, hearing and speech problems, hyperactivity, memory problems, trouble concentrating, and behavior and learning problems.

**67.**

The Environmental Protection Agency ("EPA"), Food and Drug Administration ("FDA"), the World Health Organization ("WHO"), Center for Disease Control and Prevention ("CDC"), and the American Medical Association ("AMA") have all independently stated that there is no safe level of lead.

**68.**

The EPA proclaims: "The MCLG for lead is zero. EPA has set this level based on the best available science which shows there is no safe level of exposure to lead. The fact that there is no safe level of exposure underscores the fact that any action to reduce exposures can have impacts on lives and livelihoods."[18]  Similarly, (1) the WHO has likewise stated that "[t]here is no known safe blood lead concentration"[19]; (2) the CDC stated that "no safe blood lead level has been identified"; (3) the FDA has declared that "[n]o safe level of lead exposure has been identified for protecting children's health"[20] and that "[l]ead is toxic to humans and can affect people of any age or health status"[21]; and (4) the AMA explains that "we know that there is no safe level of lead."[22]

---

[18] EPA, *Basic Information about Lead in Drinking Water*, *available at* https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-in-drinking-water.

[19] WHO, *Lead Poisoning,* available at https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health.

[20] FDA, *Action Levels for Lead in Food Intended for Babies and Young Children: Draft Guidance for Industry* (January 2023), *available at* https://www.fda.gov/media/164684/download.

[21] FDA, *Lead in Food, Foodwares, and Dietary* Supplements, *available at* https://www.fda.gov/food/environmental-contaminants-food/lead-food-foodwares-and-dietary-supplements#:~:text=Lead%20is%20toxic%20to%20humans,in%20food%20can%20be%20reduced.

[22] AMA, *AMA adopts new policies to prevent future lead poisoning*, *available at* https://www.ama-assn.org/press-center/press-releases/ama-adopts-new-policies-prevent-future-lead-poisoning

**69.**

The CDC warns that lead in soil is "hazardous."[23]  Lead can be transferred from the soil into the body by being inhaled as soil dust or by being directly ingested.  Exposure to lead in soil is especially likely to occur in children:

- Children can be exposed to lead in soil by swallowing or breathing in lead-contaminated soil while playing.
- Lead-contaminated soil particles can also be brought inside as lead dust or on shoes, clothing, or pets.
- Young children tend to put their hands, which may be contaminated with lead dust from soil, into their mouths.
- Some young children eat soil (this is called pica). Children may also be exposed to lead by eating fruits and vegetables grown in or near lead-contaminated soil.[24]

**70.**

The CDC further warns that "[l]ead in soil can get into groundwater."[25] "EPA has set the maximum contaminant level goal for lead in drinking water at zero because lead can be harmful to human health even at low exposure levels."[26]

**71.**

Lead exposure can lead to immediately ascertainable health impacts.  Lead exposure can also lead to latent health issues long after exposure due to lead being stored in tissue and bones for decades.

**72.**

The Wall Street Journal reporting included the following depiction of how lead travels through the human body:

---

[23] CDC, *Lead in Soil*, *available at* https://www.cdc.gov/nceh/lead/prevention/sources/soil.htm
[24] *Id.*
[25] CDC, *ToxFAQs for Lead*, *available at*
https://wwwn.cdc.gov/TSP/ToxFAQs/ToxFAQsDetails.aspx?faqid=93&toxid=22.
[26] CDC, *Lead in Drinking Water*, *available at* https://www.cdc.gov/nceh/lead/prevention/sources/water.htm

**G.     Defendants and their Senior Executives Have Known for Years that the Vast
Network of Lead Cables are Harmful to People and the Environment.**

**73.**

More than a decade ago, John Malone, a senior AT&T manager, cautioned a group of
telecom officials about the dangers of lead-sheathed cables crisscrossing the nation.  His slide
presentation said, "Some older metropolitan areas may still have over 50% lead cable."  In some
places, they posed risks for phone-company workers and the surrounding environment, Malone
concluded.[27]

**74.**

As The Wall Street Journal reported:

For decades, AT&T, Verizon and other firms dating back to the old Bell
System have known that the lead in their networks was a possible health risk to
their workers and had the potential to leach into the nearby environment, according
to documents and interviews with former employees. They knew their employees
working with lead regularly had high amounts of metal in their blood, studies from
the 1970s and 80s show.  Environmental records from an AT&T smelting unit in
the 1980s show contamination in the soil. Government agencies have conducted
inspections, prompted by worker complaints, that led to citations for violations

---

[27] Ramachandran, et al., *supra* note 5.

involving lead exposure and other hazardous materials more than a dozen times over four decades, records show.

\*\*\*

Over the years, AT&T officials themselves expressed concern about possible worker exposure to lead.

\*\*\*

They knew the risks, but they didn't want to do a lot of mitigate it," said James Winn, who worked as a cable splicer among other jobs for the Bell System companies for 45 years. Company testing in the 1980s found that he had high levels of lead in his blood, but his manager told him to go back to working with lead shortly after, he said.[28]

**75.**

Bell Laboratories, the Bell System's technology and science engine, was a leader in lead research in the 1970s and invented a device that could screen for lead exposure from a drop of blood.[29]

**76.**

A 1977 Bell study found high blood-lead levels among 40 female hand solderers. The study found that 23% of the solderers had blood levers of 20-29, 73% had blood levels of 30-39, and 5% had blood levels of more than 40.  The potential health effects for these levels include:

- Up to 5 micrograms per deciliter:  Reduced fetal growth, reduced kidney function;

- Up to 10 micrograms per deciliter:  Spontaneous abortion, cardiovascular effects, neurological problems, gastrointestinal symptoms;

- 10-20 micrograms per deciliter: Decreased blood hemoglobin, decreased fertility;

---

[28] *Id.*
[29] *Id.*

- 20-40 micrograms per deciliter: Anemia, bowel changes, neuropathy, psychiatric symptoms.

- More than 40 micrograms per deciliter: Preterm birth, lung disease, muscle weakness, thyroid issues, decreased cognitive function.[30]

**77.**

Blood tests showed high lead levels in another group of workers—cable splicers, who fixed and maintained cables. A 1978 letter between Communications Workers of America union and officials said that AT&T "has confirmed that cable splicers may be exposed to a lead hazard."[31]

**78.**

A CenturyLink—now Lumen—employee alerted officials that he was feeling intensely fatigued following working in manholes, triggering a 2013 OSHA investigation that led to nine "serious" lead-related citations, according to union officials and regulatory records for CenturyLink.[32]

**79.**

Between 2007 and 2016, blood-test results for 208 Verizon workers showed that 85, or more than 40%, had lead levels above the 3.5 micrograms per deciliter level that the CDC suggests medical attention is sought, according to Verizon data shared with the union.[33]  A 2023 study at Mount Siani of 20 Verizon workers, with an average tenure of 23 years, showed that 60% had measurable lead in their tibias.[34]

---

[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] *Id.*

**80.**

Over the years, Defendants have coordinated to keep their lead legacy hidden from the
public, reduce regulatory oversight and reporting, and in general lessen the chances that they will
have to remove the lead-cable network and associated equipment and remediate the lead from the
environment that has been caused by these lead lines and equipment.

**81.**

For example, despite knowing of the risks related to lead, Lumen, AT&T, and Verizon
launched a coordinated campaign to actively oppose new environmental regulations by the EPA
that would impose additional recordkeeping and notification requirements for the disposal of lead
cable parts.

**82.**

On July 22, 2011, the EPA published a notice which proposed a variety of changes to the
2008 DSW Rule (the "2011 DSW Proposal"). *See* 76 Fed. Reg. 44094 (2011). Among other things,
the proposal outlined potential revisions to the generator-controlled recycling exclusion from the
EPA's definition of solid waste, and requested public comment on additional revisions under
consideration that would codify enhanced recordkeeping and notification requirements for the
preexisting exclusions, including the exclusion for the forms of scrap metal covered in 40 C.F.R.
261.4(a)(13). On October 20, 2011, Griff Bond, who was serving as the Chair of the EHSCP,
submitted a comment letter on behalf of the EHSCP in response to the EPA's 2011 proposed
revisions to the 2011 DSW Proposal.  The letter established Mr. Bond's knowledge of lead-
sheathed telecommunications cables and their status as a federal controlled waste product.  In a
section of the letter bearing the heading, "Impacts to generators of recyclable materials covered by
existing exclusions and exemptions," Bond explained that "[t]he proposed rule would apply to

several types of recyclable materials that are **commonly generated by EHSCP member companies**," including **"lead-acid batteries"** and **"lead-sheathed telecommunications cable."** He then explained that the EHSCP opposed the new administrative requirements because of the potential burdens they would impose on member companies like CenturyLink who owned lead-sheathed cables:

> An even greater challenge would be posed by regulating lead-sheathed telecommunications cable. Such cable is removed from the ground, for example, when a road-widening project required a buried cable to be moved, in which case it is replaced with a new cable. The removed cable typically is brought back to a company or contractor facility, from which a contracted hauler transports it to a metal reclamation facility. Regulating such activity could turn every roadside into a regulation generating site, creating enormous restrictions and paperwork burdens for no environmental benefit. We suspect that there are other businesses with comparable situations.

The letter was signed by Grif Bond as "Chair" of the EHSCP as well ad "Manager Environmental, Health & Safety" at CenturyLink.

**83.**

AT&T and Verizon both prominent members of the EHSCP, each submitted a letter in response to the 2011 DSW Proposal which incorporated by reference the concerns and recommendations expressed in the letter submitted by Grif Bond. Both letters attached a copy of the October 20, 2011 letter from Grif Bond. This close coordination between the Defendants is indicative of their collective conduct and attitude towards continuing to save money by reducing regulation over their shared lead legacy and avoid the costs associated with removing it in order to protect people and the environment from lead exposure.

H.     **Defendants' network of lead sheathed cables and associated lead equipment litters Louisiana and is a violation of Louisiana law.**

**84.**

The lead-covered cables and the associated lead equipment are an unlawful intrusion on private property and are causing property damage and a risk to human health. Defendants have violated Louisiana law.

**85.**

Article IX, section 1, of the Constitution of the State of Louisiana provides: "The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. The legislature shall enact laws to implement this policy."

**86.**

In New Orleans, the *Wall Street Journal* reported a lead cable sticking out from under a bridge where tourists walk and where homeless people live. "Lead in the sediment there was 19.8 times the EPA guidelines for where children could play."[35]

**87.**

The *Wall Street Journal* went on to report that,

Atop a levee in Donaldsonville, La, along the Mississippi, families often stroll near two abandoned cables, one smashed on the ground and the other with a splice box, a large lead casing used to connect cables sealed with molten lead.[36]  A sediment sample taken next to the smashed cable and splice box showed lead at "2,850 and 2,800 parts per million, respectively—both seven times the EPA guideline for play areas."[37] "Across the street from the park in a yard strewn with children's toys, an extension of a lead-covered cable and a lead slice box sit in the front of the house

---

[35] Pulliam, et al., *supra* note 11.
[36] *Id.*
[37] *Id.*

of … a 60-year-old mail carrier who had 10 grandchildren.  The [sampling] showed a reading of more than 4,000 parts per million at the site of this cable.[38]

**88.**

A cable in New Iberia on Bayou Teche is located where the town hosts a "gumbo cook-off and an annual canoe race."[39]

**89.**

"Another lead-sheathed cable juts out of a swampy pond next to Bayou Teche in Franklin, [Louisiana]. An analysis of the water sample from the pond showed lead at 471 parts per billion."[40]



**Photo credit: *Wall Street Journal***

**90.**

Bayou Teche was deemed an "epicenter of America's lead cable problem" by the *Wall Street Journal*.[41]

---

[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] John West, et al., *Bayou Teche is an Epicenter of America's Lead Cable Problem*, WALL ST. J. (Jul. 10, 2023), *available at* https://www.wsj.com/articles/lead-cables-louisiana-telecoms-59f36ffe?mod=series_leadlegacy.

Reporters found cables protruding from banks, resting under bridges, snaking under water and drooping from the air at dozens of sites. Testing showed that many are leaching toxic metal into the ground and water. Southern Louisiana's 125-mile-long Bayou Teche flows through a region particularly dense with cables. Southern Bell filed permits with the U.S. Army Corps of Engineers starting in the 1930s to place more than a dozen cables across the bayou. *Journal* reporters, with the assistance of environmental researchers, tested the water in nine places along the bayou and the sediment in three of them. Of those 12 tests, eight showed elevated levels of lead. A sediment sample near the cable in New Iberia exceeded the safety recommendation set by the Environmental Protection Agency for areas where children play.[42]

Parts of Bayou Teche are used for drinking water.

**91.**

In New Iberia, one of the cables sits near the center of town on the surface near a sidewalk and crossing under the water near the bridge.[43] "The cable runs underground and under the bayou to a point on the opposite bank, where it rises up from the surface. The cable would have connected to a telephone pole—all that's left is a chopped-off remnant."[44]



---

[42] *Id.*
[43] *Id.*
[44] *Id.*

**Photo credit:** *Wall Street Journal*

**92.**

According to the *Wall Street Journal*, "here's how the contamination happens" in the soil and the water surrounding the lead cables and equipment:



**Photo credit: Wall Street Journal**

**93.**

"An environmental consultant who lives in New Iberia [and was interviewed by the *Wall Street Journal*], said cables like the one in her town, sticking up from the ground on the bank, are a potential attraction for children. They 'don't know it's lead,' she said. 'There is no warning sign.'"[45]

**94.**

The locations where *The Wall Street Journal* found leaden cables in St. Mary Parish were often not far from schools and were near where children play.[46]

---

[45] *Id.*
[46] *Id.*



**Photo credit:** *Wall Street Journal*

I.    **The Environmental Defense Fund also investigated the Lead-Sheathed Telecommunications Cables and Equipment.**

**95.**

In association with *The Wall Street Journal*, the Environmental Defense Fund conducted its own "Lead Cable Investigation."[47] Through its investigation, the Environmental Defense Fund visited and took environmental samples at lead telephone cable/equipment sites all over the country identified by *The Wall Street Journal*. As part of the report ultimately published by the Environmental Defense Fund, photos were taken of the lead cables and equipment. Some of those photos are included below:

---

[47] Environmental Defense Fund, *Lead Cable Investigation* (Jun. 30, 2023), *available at* https://www.edf.org/sites/default/files/2023-07/MTS_EDF%20Lead%20Cable%20Investigation_Final.pdf.



**(E) Rd. 320 southeast of New Iberia, LA. Cluster of lead sheathed cables under the Oliver Bridge. BT 17.1. June 2022, New Iberia, Louisiana.**

**Photo credit: Environmental Defense Fund**



**(F) Up close photo of bare lead sheathed cables coming from the bottom of a lead splice box (upper left corner of photo). BT 24.1. June 2022, St. Martinville, Louisiana.**

**Photo credit: Environmental Defense Fund**



(H) Exposed lead splice box with attached cables and drainage into the Bayou Teche. BT 26.2. June 2022, Franklin, Louisiana.

**Photo credit: Environmental Defense Fund**



(M) Donaldsonville, LA. Location MISS 12.1. Exposed leaded splice box that appears to still be connected to an air test line. See photo (L) for the abandoned cable just the other side of the splice box. June 2022,



(G) Bare lead sheathed cables going into a lead splice box near the sidewalk leading into the Historical District. BT 24.1. June 2022, St Martinville, Louisiana.

**Photo credits: Environmental Defense Fund**



(L) New Orleans, LA. MISS 3.1. Remnants of outer steel wire from a lead sheathed cable. Evidence that parts of the cable may have been scrapped for money. Locals told us that that was done to these cables.



(J) New Orleans, LA. MISS 3.1. is an abandoned collection of cables.

**Photo credits: Environmental Defense Fund**



(N) Donaldsonville, LA. Location MISS 12.1. Close up of lead sheathed cable next to lead splice box seen in (K). June 2022.

**Photo credit: Environmental Defense Fund**

**96.**

The Environmental Defense Fund concluded that the "findings in Louisiana were robust" and "recommended that a more in-depth survey of the state be performed" because it found that "it is likely that more lead sheathed cables would be discovered."[48]

**97.**

Further, in its June 17, 2023 letter to the Environmental Protection Agency, the Environmental Defense Fund implored the EPA to act upon the "uncontrolled release of lead into the water or surface soil from more than 2,000 lead-sheathed telecom and power cables across the nation with more than 300 of these cables posing a threat to the source of drinking water for

---

[48] *Id.*

communities."[49]  The Environmental Defense Fund concluded that it "expect[s] that the risk posed by the cables will increase as they further deteriorate and release lead into the environment."[50]  The Environmental Defense Fund recommended "immediate removal" of many of the lead-sheathed cables and junction boxes, as well as removal of the "soil contamination" caused by the lead cables and equipment.[51]

**J.    Louisiana is littered with lead telephone cables and lead telecom equipment.**

**98.**

The Environmental Defense Fund's prognosis that Louisiana's lead telephone cable problem is far more widespread than its investigation showed was spot-on. In fact, the *Wall Street Journal* and the Environmental Defense Fund only uncovered the tip of the iceberg when it comes to the extent of the lead telephone cables and telecom equipment strewn across Louisiana.

**99.**

In Franklin, Louisiana, many additional locations of lead telephone cables and telecom equipment have been identified.  The following photos are examples of these locations:

---

[49] July 17, 2023, Letter from the Environmental Defense Fund to the Environmental Protection Agency (https://www.edf.org/sites/default/files/2023-07/EDF-CWA-BtB%20Letter%20to%20EPA%20Administrator%20on%20Lead%20Cables%20-%20FINAL%207-17-23.pdf)
[50] *Id.*

[51] *Id.*





 

 

 

**100.**

The following is an example of lead telecom equipment found in Lafayette, Louisiana:

 

**101.**

The following are examples of lead telecom equipment located in St. Bernard Parish:

 

**102.**

The following are examples of lead telecom equipment found in Morgan City, Louisiana:



**103.**

On information and belief, there are thousands of other locations across Louisiana where Defendants have left their lead cables and equipment.

**K.      The lead equipment and cables found on the Named Plaintiffs' properties are typical of the class.**

The lead splice boxes and associated lead cables found on the Named Plaintiffs' properties are typical of the class.  A comparison of the pictures of the lead splice boxes identified by the *Wall Street Journal* and the Environmental Defense Fund shows that the lead splice boxes and associated cables found on the Named Plaintiff's properties are typical of the class as a whole.

**104.**

For instance, the lead splice box and associated lead cables found on Gary Blum's property is pictured below:

 

47

**105.**

The lead splice box found on Lucia Billiot's property is pictured below:



**L.     Defendants continue to disguise the lead cables and associated lead telecom equipment instead of removing them.**

**106.**

In a written statement to the *Wall Street Journal*, AT&T stated: "The health, safety, and well-being of our people, our customers, and our communities is of paramount importance."[52] Similarly, Verizon said it is "taking these concerns regarding lead-sheathed cables very seriously."[53]

**107.**

Despite these statements, instead of removing the offending lead cables and equipment identified by the *Wall Street Journal* and the Environmental Defense Fund, Defendants have chosen, once again, to take the cheap way out and put a Band-Aid over the problem.

---

[52] Pulliam, et al., *supra* note 11.
[53] *Id.*

**108.**

For example, in Franklin, Louisiana, instead of removing the lead splice box and the associated lead cables, Defendants chose the cheapest solution, which was to simply cover the splice box with a plastic cover. Defendants did nothing to remove the lead cables or equipment, nor did they take any steps to prevent the lead from the cables or equipment under the plastic box from continuing to come into contact with the soil, the surface water, including potentially Bayou Teche, or the groundwater.

 

**109.**

Similarly, in New Iberia, LA, instead of removing the lead splice box and associated cables, Defendants chose to place a piece of metal over part of the splice box. This piece of metal does not protect the lead splice box from the elements, nor does it do anything to prevent this lead equipment from continuing to degrade and contaminate the soil or water nearby. In fact, a picture

taken from above the metal cover shows that the lead splice box is still in place and exposed to the elements.

  

(G) Bare lead sheathed cables going into a lead splice box near the sidewalk leading into the Historical District. BT 24.1. June 2022, St Martinville, Louisiana.

**M.    Defendants' concerted action to keep their legacy of lead a secret.**

**110.**

Defendants engaged in a concerted action to hide the presence of the lead telecommunications cables and equipment from the public.

**111.**

Defendants made false and misleading statements and disclosures about their commitment to protecting the environment and upholding safety and other regulatory standards. When Defendants made these false and misleading statements, they failed to disclose that they own lead cables and equipment around the country, including in Louisiana, that are highly toxic, dangerous to people, and harmful to the environment.

**112.**

On information and belief, Defendants made false statements to and failed to disclose the presence of the lead cables and equipment to regulators as part of a concerted action to avoid regulatory liability or other liability.

**113.**

Defendants were uniquely aligned and similarly financially motivated to avoid the cost of removing the lead telecommunications cables and equipment and the remediation of the contamination caused by the lead telecommunications cables and equipment.

**114.**

Defendants were in possession of confidential proprietary information concerning the lead cables and equipment, and they colluded to not share it with the public, their investors, regulators, or other government and trade officials in order to avoid the costs of removal, remediation, and other liability.

**115.**

Defendants not only have an interest in keeping the existence of their own lead cables and equipment a secret, they also have an interest in keeping each other's lead legacy a secret. In many circumstances, Defendants have entered into agreements with one another to use each other's telephone cables and equipment. The Defendants control a huge segment of the telephone industry. By using each other's cables, equipment, and networks, they are able to control even more of the market. It was in the Defendants' joint interest for the lead cables and equipment to go undetected such that they could continue to build their telecom dynasties and castoff the liability associated with the lead legacy they were leaving behind.

**116.**

Even after the *Wall Street Journal* broke the story and the existence of the lead cables and equipment was uncovered, Defendants have continued to act in concert to keep the location and extent of the lead cables and equipment a secret.

**117.**

The Named Plaintiffs (and those similarly situated as the putative class members) did not know of the alleged damaged until less than one year before the filing of the Original Petition.

**118.**

**CLASS ACTION REQUISITES**

**119.**

The Named Plaintiffs and all those similarly situated, as defined above, are entitled to maintain this action as a class action pursuant to La. C.C.P. art. 591 for the following reasons:

119.1   The Class consists of more than 40 individuals who own property impacted by Defendants' conduct, so numerous that joinder of all members is impracticable, satisfying La. C.C.P. art. 591(A)(1).

119.2   Questions of law and fact common to all members of the Class are numerous, satisfying La. C.C.P. art. 591(A)(2); and those common questions of law and fact also predominate over individual issues, satisfying La. C.C.P. art. 591(B)(3). Those common questions of law and fact include but are not limited to:

119.2.1 Whether Defendants' conduct alleged herein violates the laws as stated in the Causes of Action section, *infra*;

119.2.2 The steps Defendants could have taken to remove the lead-covered cables and associated lead equipment.

119.2.3 The steps Defendants could have taken to prevent the contamination of soil, surface water, and groundwater;

119.2.4 Whether Defendants owe a duty to the Class;

119.2.5 Whether Defendants breached those duties to the Class;

119.2.6 Whether Defendants are responsible for the removal of the lead-covered cables and associated lead equipment.

119.2.7 Whether Defendants are liable to putative Class Members for damages related to the contamination of soil, surface water, and/or groundwater.

119.2.8 The measure of damages to putative Class Members;

119.2.9 Whether Defendants are liable for attorneys' fees and costs pursuant to applicable law.

119.2.10    The appropriate nature of class-wide relief;

119.3    The claims of the Named Plaintiffs, who own property upon which, or adjacent to, the Defendants' lead-based cables and/or equipment, are typical of the claims of the proposed Class Members against Defendants, as required under La. C.C.P. art. 591(A)(3), because the Named Plaintiffs reside in Louisiana and own property propinquitous to Defendants' lead-covered cables and/or equipment, and that property has been unlawfully invaded by and/or otherwise damaged by the lead cables and/or equipment.

119.4    The Named Plaintiffs will fairly and adequately protect the interests of the proposed Class, as required under La. C.C.P. art. 591(A)(4), because they have an interest in removal of the lead cables/equipment, in preventing or ameliorating future deleterious effects of contamination on their property, and rectifying the damage caused by past contamination to their property.

119.5   The criteria for defining the proposed Class, as set out above, are objectively ascertainable on the face of written instruments—namely, people who own immovable property that has been damaged by Defendants' lead-covered cables and equipment in Louisiana.

119.6   Certification of a Class under La. C.C.P. art. 591(B)(1) is appropriate, because the prosecution of separate actions by individuals rather than a Class as proposed would create a risk of inconsistent or varying adjudications and the potential for imposition of inconsistent duties owed  by Defendants and for prejudicial determinations as to the rights of subsequent plaintiffs, as Defendants' conduct has harmed multiple class members based on a common pattern of conduct, with that harm being of a common character through a common causal process.

119.7   Alternatively, certification of a Class under La. C.C.P. art. 591(B)(2) is appropriate because, due to the widespread effect of the Defendants' actions, any resistance of liability by the Defendants would be applicable to the whole of the proposed class, making class-wide injunctive relief appropriate.

119.8   Alternatively, if damages are deemed an appropriate remedy rather than class-wide adjudication of rights under La. C.C.P. art. 591(B)(1) or injunctive relief under La. C.C.P. art. 591(B)(2), then certification under La. C.C.P. art. 591(B)(3) is appropriate because, as noted above, the common issues of fact and law predominate over those issues that may pertain to individual plaintiffs' claims.

119.9   Also in satisfaction of La. C.C.P. art. 591(B)(3), the class action procedure is superior to other methods for the fair and efficient adjudication of the claims herein, because:

119.9.1 It is desirable to concentrate all litigation regarding the removal of the lead cables/equipment and the crisis created due to the contamination of the soil, surface water, and groundwater within a single forum;

119.9.2 Class litigation is an efficient mechanism for managing the claims of the class members, due to the opportunity to afford reasonable notice of significant phases of the litigation to class members and to permit a systemic and integrated remedy and injunctive relief or, alternatively, distribution of any damages recovered; and

119.9.3 The vindication of public policy interests in addressing contamination in requiring Defendants' to comply with the law are implicated and therefore justify the invocation of the process of class litigation, including any attendant costs or burdens.

119.9.4 Upon a determination of liability, causation, and entitlement to remedy, this Court may appoint a special master to administer a remediation and restoration plan and/or apportionment among the class members of compensation for restoration costs and damages as appropriate.

119.10 Further, even if the Court were to determine that certification is not appropriate as to some issues in this litigation, it may certify the Class for purposes of those particular issues that resolve common, class-wide issues as to which inconsistent adjudication would be detrimental, under La. C.C.P. art. 592(D).

## CAUSES OF ACTION

### COUNT 1: NEGLIGENCE (CLASS COUNT)

### 120.

Plaintiffs incorporate by reference all allegations in the preceding and subsequent paragraphs as if fully set forth herein.

**121.**

Defendants, while engaging in the operation of their telecommunications business, have a duty to use reasonable care to avoid damage to others. This duty has existed throughout the time each of the Defendants owned and/or operated the lead-covered cables and associated lead equipment.

**122.**

Defendants also have and have had a duty to comply with various Louisiana regulations and laws governing environmental contamination and lead.

**123.**

As specified in the allegations above, Defendants breached these duties while owning and operating the lead-covered cables and associated lead equipment, which has resulted in damage to Plaintiffs' Property.

**124.**

Plaintiffs were not aware that Defendants had left lead cables and equipment on, or adjacent to, their property or that the lead cables and equipment had contaminated their property until, at the earliest, the *Wall Street Journal's* reporting in July 2023.

**125.**

Defendants have a duty to remove the offending lead-covered telephone cables and associated lead-based equipment that is on, or adjacent to, Plaintiffs' property.

**126.**

In addition, Defendants have and have had the duty to clean up any contamination resulting from their lead cables and/or equipment, including in the soil, surface water, and groundwater, and to prevent it from migrating onto neighboring properties.

**127.**

As a result of each Defendant's breach of these various duties, lead-covered telephone cables and associated lead equipment remain on, or adjacent to, Plaintiffs' Property and must be removed. Further, the soil, surface water, and groundwater on and underlying the Plaintiffs' Property is contaminated with lead. Defendants are therefore liable for all damages and remedies detailed further below.

**128.**

Plaintiffs did not have knowledge of the damages sought herein before 2023.

**COUNT 2: BREACH OF THE OBLIGATIONS OF HOLDERS OF PERSONAL SERVITUDES OF RIGHTS OF USE, THROUGH BREACH OF SUPPLETIVE-RULES OBLIGATIONS AND VIOLATION OF PUBLIC POLICY (CLASS COUNT)**

**129.**

Plaintiffs incorporate by reference all allegations in the preceding and subsequent paragraphs as if fully set forth herein.

**130.**

In circumstances where Defendants or their predecessors obtained right-of-way agreements that gave them the authority to install the telecommunications cables and equipment on the Plaintiffs' Property, a personal servitude of right of use in favor of one or more of the Defendants was created. A right of use is a limited personal servitude that confers the benefits of the predial servitude and usufruct upon a juridical person rather than upon an estate.

**131.**

While in some circumstances, Defendants obtained right of use servitudes directly from Plaintiffs themselves. In other circumstances, Defendants obtained rights of use and/or permits

from the State of Louisiana, the parishes, or other local governments, for which the Plaintiffs are third party beneficiaries.

**132.**

Pursuant to Louisiana Civil Code article 645, "[a] right of use is regulated by application of the rules governing usufruct and predial servitudes to the extent that their application is compatible with the rules governing a right of use servitude."

**133.**

Regarding the rules governing usufruct, Louisiana Civil Code article 576 provides that "the usufructuary [Defendant] is answerable for losses resulting from his fraud, default, or neglect." Louisiana Civil Code article 577 similarly provides:

> The usufructuary [Defendants] is responsible for ordinary maintenance and repairs for keeping the property subject to the usufruct in good order, whether the need for these repairs arises from accident or force majeure, the normal use of things, or his fault or neglect.
>
> The naked owner [Plaintiffs] is responsible for extraordinary repairs, unless they have become necessary as a result of the usufructuary's [Defendants'] fault or neglect in which case the usufructuary [Defendants] is bound to make them at his cost.

**134.**

Defendants are obligated under Civil Code article 539 to use the class members' properties as a prudent administrator, and to preserve those properties as much as possible so that the properties may be restored to the class members at the end of the right-of-use servitude.

**135.**

Louisiana Civil Code article 579 provides that, "[d]uring the existence of the usufruct, the naked owner [Plaintiffs and those similarly situated] may compel the usufructuary [Defendants] to make the repairs for which the usufructuary is responsible."

**136.**

Regarding the rules governing predial servitudes, Defendants became the dominant estate owners while Plaintiffs are the owners of the servient estate.

**137.**

Under Louisiana Civil Code article 730, "doubt as to the existence, extent, or manner of exercise of a predial servitude shall be resolved in favor of the servient estate."

**138.**

Louisiana Civil Code article 743 provides that rights that are necessary for the use of the servitude "are to be exercised in a way least inconvenient for the servient estate"; and article 745 provides that the dominant estate owner is "under the obligation of causing the least possible damage."

**139.**

Defendants also had the obligation to not aggravate the condition of the class members' servient estates.

**140.**

Defendants cannot be exonerated from these obligations because such exoneration would violate clear Louisiana public policy requiring the preservation of the natural resources of Louisiana.

**141.**

Accordingly, the Defendants had obligations to Plaintiffs to operate in such a manner that did not result in lead-covered cables and associated lead equipment being left on Plaintiffs' Properties long after it was obsolete and newer, safer materials were available and to prevent

damage to Plaintiffs' Properties as a result of the lead telecommunications cables and equipment, including preventing contamination of soil, surface water, and groundwater.

**142.**

Defendants breached these obligations, and as a result lead-covered cables and associated lead equipment remain on, or adjacent to, Plaintiffs' Properties, and the properties have been contaminated by the presence of the lead-based telecommunications cables and equipment.

**143.**

Defendants breached these obligations by failing to remove the lead telecommunications cables and equipment and failing to repair any damage to Plaintiffs' Properties caused by the lead cables and equipment. These actions constitute breaches of Defendants' obligations to not aggravate and to cause the least possible damage to the servient estate.

**144.**

Defendants have breached and continue to breach the foregoing obligations.

**145.**

Defendants' duties to not aggravate the condition of the servient estate are co-extensive with the life of the servitudes and, accordingly, are continuous.

**146.**

Defendants are in continuing breach of those obligations and duties.

**147.**

The damage to Plaintiffs' property was reasonably foreseeable to Defendants.

**148.**

Defendants' have long known that the lead telecommunications cables and equipment are leeching lead into the environment, including on and adjacent to Plaintiffs' Properties, and that lead is dangerous and hazardous to human health.

**149.**

Defendants colluded to hide the presence of the lead telephone cables and equipment from the Plaintiffs and the public at large.  Defendants colluded in order to save money and avoid the consequences of Plaintiffs and the public finding out about the presence of the lead equipment across Louisiana, including the financial risk of having to remove the lead cables and equipment and remediate and restore the contamination of Plaintiff's Properties caused by the lead cables and equipment.

**150.**

Defendants' breaches were in bad faith, and these breaches caused damage to the class members.

**151.**

As a result of Defendants' bad faith breach of their servitude obligations, Defendants are liable to class members not only for all damages that are foreseeable under Louisiana Civil Code article 1996, but also for all consequential damages under Louisiana Civil Code article 1997.

**152.**

Defendants are liable to class members for any and all remedies determined to be appropriate by this Court, including but not limited to injunctive relief for removal of the lead cables and equipment, restoration of the Plaintiffs' Properties, and/or monetary compensation in

the amount that would compensate Plaintiffs for Defendants' breach of their obligations to remove the lead cables and equipment and remediate the lead contamination on the property.

## COUNT 3: ABUSE OF RIGHT (CLASS COUNT)

### 153.

Plaintiffs incorporate by reference all allegations in the preceding and subsequent paragraphs as if fully set forth herein.

### 154.

The Defendants' abused their right to use Plaintiffs' Properties by leaving lead telecommunications cables and equipment on, or adjacent to, Plaintiffs' Properties long after it was obsolete and by contaminating Plaintiffs' Properties with lead:

- There is no serious or legitimate motive for Defendants to leave the lead cables and equipment in place after new lines were installed.

- Defendants knew that leaving the lead cables and equipment on, or adjacent to, Plaintiffs' Properties would result in contamination and diminution of property values. These actions were in bad faith and against public policy; and

- Defendants' decision to leave the obsolete lead-based equipment on the property was not done for the purpose of installing, constructing, operating, or maintaining a telecommunications network because the network has been upgraded several times with newer, safer cables and associated equipment that do not contain lead.

### 155.

Pursuant to Louisiana Civil Code article 623, "The usufruct may be terminated by the naked owner if the usufructuary commits waste, alienates things without authority, neglects to make ordinary repairs, or abuses his enjoyment in any other manner." Accordingly, in addition to the remedies sought above for breach of contract, the Defendants' abuse of right also allows for the remedy of termination of the telephone rights-of-way. Accordingly, the class members are

entitled to the termination of the rights-of-way and restoration and return of their property in the condition it was in at the inception of the rights-of-way.

## 156.

Pursuant to Louisiana Civil Code article 621, "A usufruct terminates by the prescription of nonuse if neither the usufructuary not any other person acting in his name exercises the right during a period of ten years. This applies whether the usufruct has been constituted on an entire estate or on a divided or undivided part of an estate."

## COUNT 4: TRESPASS (CLASS COUNT)

## 157.

Plaintiffs incorporate by reference all allegations in the preceding and subsequent paragraphs as if fully set forth herein.

## 158.

The Defendants owed (and continue to owe) a duty to the Plaintiffs not to trespass.

## 159.

Defendants' lead cables and equipment are an unauthorized physical invasion of Plaintiffs' Properties that is considered a trespass. For example, in many circumstances, Defendants did not have authorization to install the lead cables and equipment on Plaintiffs' Properties because they failed to obtain the proper servitudes or other authority to install the lead cables and equipment on Plaintiffs' Properties. Further, Defendants have no authority to contaminate Plaintiffs' Properties with lead and leave the lead on the property long after the cables have become obsolete. The offending lead cables and equipment, as well as the contamination that has resulted, are trespassing on Plaintiffs' Properties. This trespass will continue until the offending lead cables and equipment are removed and the contamination is remediated.

**160.**

Defendants' actions have resulted in environmental contamination of the soil, the surface water on, and the groundwater underlying, Plaintiffs' Properties, which constitutes a trespass.

**161.**

The ongoing invasion of the Plaintiffs' property rights constitutes a continuing trespass on Plaintiffs' Properties.

**162.**

Plaintiffs aver that the Defendants' actions have resulted in an encroachment of their property by the (1) unauthorized lead cables and equipment and (2) the contamination resulting from these lead cables and equipment.  This encroachment is a continuous and unlawful invasion of the Plaintiffs' rights. Plaintiffs are entitled to have this trespass abated. The contamination is causing new and ever-increasing damage to Plaintiffs' property, and such damage will continue until the lead cables and associated lead equipment are removed, the contamination is halted, and the contamination is removed.

**163.**

This trespass will continue day-to-day until the Defendants' offending conduct is abated.

**164.**

The Plaintiffs aver that they are entitled to compensatory damages because of the Defendants' acts and omissions and are entitled to injunctive relief in the form of removal of the lead cables and equipment, as well as restoration of the land, water, and groundwater.

**165.**

Further, the Defendants' trespasses were conducted in legal and moral bad faith as they acted with reckless indifference and in wanton disregard of the Plaintiffs' property rights.

Accordingly, Plaintiffs are entitled to disgorgement of the Defendants' revenues because of the Defendants' moral bad faith trespasses.

**166.**

The Plaintiffs desire and are entitled to require the Defendants to return Plaintiffs' Properties to the condition they were in before the unauthorized lead cables and associated equipment were installed and the contamination occurred. In the alternative, the Plaintiffs desire and are entitled to damages to cover the cost of restoring the Properties to their prior condition.

**COUNT 5: NUISANCE (CLASS COUNT)**

**167.**

Plaintiffs incorporate by reference all allegations in the preceding and subsequent paragraphs as if fully set forth herein.

**168.**

In addition to the basic Civil Code article 2315-based duties discussed above, Defendants each have the specific duty to Plaintiffs owed to a neighbor under Civil Code articles 667, *et seq.*

**169.**

Defendants' activities have severely deprived Plaintiffs of the enjoyment of their own property, as the ability to enjoy their property as they see fit is wholly undermined by the presence of lead cables and equipment on, or adjacent to, Plaintiffs' Property and the extraordinary contamination of their property, surface water, and groundwater underlying their property by Defendants' actions.

**170.**

Plaintiffs own properties neighboring the location of Defendants' telecommunications equipment.

**171.**

Defendants knew or should have known that their activities would cause the damage to Plaintiffs' Properties. This includes, but is not limited to, Defendants' failure to remove the offending lead cables and equipment and restore the property that has been contaminated.

**172.**

Defendants have breached their vicinage duties to Plaintiffs under Civil Code article 667.

**173.**

The breach of these duties has caused damage to Plaintiffs because of the presence of lead cables and equipment on, or adjacent to, Plaintiffs' Properties and the extraordinary contamination of their properties, surface water, and groundwater underlying their Properties by Defendants' actions. Defendants are therefore liable for all damages and remedies detailed further below.

**GROUND WATER ACT AND REMEDIES AND EXEMPLARY DAMAGES**

**174.**

Plaintiffs incorporate by reference all allegations in the preceding and subsequent paragraphs as if fully set forth herein.

**175.**

Defendants are liable to provide a full cleanup of the properties of Plaintiffs and all those similarly situated as required under the injunctive remedies under LEQA.

**176.**

Pursuant to the Louisiana Ground Water Act, Defendants are liable to fund the "most feasible plan" to "evaluate or remediate the contamination and protect the usable ground water consistent with the health, safety, and welfare of the people." La. R.S. § 30:2015.1.

**177.**

In addition to groundwater remedies, Defendants are liable to Plaintiffs for compensatory damages for the cost to fully remediate the soil and surface water on the Plaintiffs' Properties, to restore the Plaintiffs' properties to the condition they were in prior to the contamination caused by Defendants' lead cables and equipment.

**178.**

Defendants are liable for all costs and expenses, including expert witness fees and reasonable attorneys' fees, incurred by Plaintiffs to remedy the contamination of their properties by Defendants, pursuant to the Louisiana Ground Water Act and under any other applicable law.

**PRAYER FOR RELIEF AND JURY DEMAND**

WHEREFORE, Plaintiffs demand judgment against Defendants, providing the following relief:

(a) Class certification of the class of Plaintiffs as alleged herein;

(b) Injunctive relief requiring removal of the lead telecommunications cables and equipment on, or adjacent to, Plaintiffs' Properties, as well as remediation of the soil, surface water, and groundwater on and underlying the Plaintiffs' Properties;

(c) Compensatory damages to be determined at trial, including for the cost to (1) remove the lead telecommunications cables and equipment on, or adjacent to, Plaintiffs' Properties; (2) remediate the Plaintiffs' Properties and (3) for any diminution of value of the Plaintiffs' Properties;

(d) Injunctive relief requiring the prevention of any further migration of hazardous substances or any other pollutants from Defendants' property onto or underneath the Plaintiffs' Properties;

(e) Civil Penalties as provided for under any applicable law;

(f) Exemplary damages as provided for under any applicable law;

(g) Attorneys' fees, expert costs, and all other expenses allowed under the Louisiana Ground Water Act, an/or any other applicable law;

(h) Injunctive relief, damages, and civil fruits from the bad faith trespass by Defendants onto the Plaintiffs' Properties;

(i) Pre-judgment and post-judgment interest to the maximum extent and at the maximum interest allowed by law; and

(j) Such other relief as the Court determines to be appropriate under law and equity.

Finally, Plaintiffs demand that this case be tried to a jury.

Respectfully submitted,

*/s/ E. Blair Schilling*
E. Blair Schilling (LA Bar No. 35308)
James R. Swanson (LA Bar No. 18455)
Kerry J. Miller (LA Bar. No. 24562)
H.S. Bartlett III (LA Bar No. 26795)
Paul C. Thibodeaux (#29446)
Lance C. McCardle (LA Bar No. 29971)
Molly L. Wells (LA Bar No. 36721)
Julie S. Meaders (LA Bar No. 39984)
Isabel Englehart (LA Bar No. 40354)
**FISHMAN HAYGOOD, LLP**
201 St. Charles Avenue, Suite 4600
New Orleans, Louisiana 70170
Telephone: (504) 586-5252
Facsimile: (504) 586-5250
Email: bschilling@fishmanhaygood.com
jswanson@fishmanhaygood.com
kmiller@fishmanhaygood.com
tbartlett@fishmanhaygood.com
pthibodeaux@fishmanhaygood.com
lmccardle@fishmanhaygood.com
mwell@fishmanhaygood.com
jmeaders@fishmanhaygood.com

ienglehart@fishmanhaygood.com

Bernard E. Boudreaux, Jr. (LA Bar No. 02219)
John T. Arnold (LA Bar No. 31601)
**JONES, SWANSON, HUDDELL, L.L.C.**
301 Main Street, Suite 1920
Baton Rouge, Louisiana 70801
Telephone: (225) 810-3165
Facsimile: (225) 810-3169
Email: bboudreaux@jonesswanson.com
jarnold@jonesswanson.com

Gladstone N. Jones, III (LA Bar No. 22221)
Lynn E. Swanson (LA Bar No. 22650)
Kevin E. Huddell (LA Bar No. 26930)
Alayne Gobeille (LA Bar No. 33856)
Thomas F. Dixon (LA Bar No. 38952)
Rosa E. Acheson (LA Bar No. 39775)
**JONES, SWANSON, HUDDELL, L.L.C.**
601 Poydras Street, Suite 2655
New Orleans, Louisiana 70130
Telephone: (504) 523-2500
Facsimile: (504) 523-2508
Email: gjones@jonesswanson.com
lswanson@jonesswanson.com
khuddell@jonesswanson.com
agobeille@jonesswanson.com
tdixon@jonesswanson.com
racheson@jonesswanson.com

*Counsel for the Plaintiffs*